UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MONROE L. COLEMAN-BEY )<br><br>Plaintiff, )<br><br>v. )<br><br>United States of America )<br><br>Defendant. ) | Civil Action No.: 06-1855 (JDB) |

**DEFENDANT'S MOTION TO DISMISS OR
IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

Defendant, through its undersigned attorneys, respectfully moves this Court to dismiss

plaintiff's complaint or in the alternative for summary judgment.   In support of this motion are

Defendant's Memorandum of Points and Authorities and Statement of Facts Not In Dispute.

Plaintiff should take notice that any factual assertions contained in the accompanying

affidavit and other attachments in support of defendant's motion will be accepted by the Court as

true unless the plaintiff submits his own affidavit or other documentary evidence contradicting

the assertions in defendant's attachments.  *See Neal v. Kelly*, 963 F.2d 453 (D.C. Cir. 1992),

Local Rule 7.1 and Fed. R. Civ. P. 56(e), which provides as follows:

> Supporting and opposing affidavits shall be made on personal
> knowledge, shall set forth such facts as would be admissible in
> evidence, and shall show affirmatively that the affiant is competent
> to testify to the matters stated therein.  Sworn or certified copies of
> all papers or parts thereof referred to in an affidavit shall be
> attached thereto or served therewith.  The court may permit
> affidavits to be supplemented or opposed by depositions, answers
> to interrogatories, or further affidavits.  When a motion for
> summary judgment is made and supported as provided in this rule,

1

an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____
RUDOLPH  CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ———————————————— | ) | |
| MONROE L. COLEMAN-BEY | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 06-1855 (JDB) |
| | ) | |
| v. | ) | |
| | ) | |
| United States of America | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

INTRODUCTION

Plaintiff Monroe L. Coleman-Bey is an inmate currently housed at the United States

Penitentiary in Terre Haute, Indiana.  Complaint at p. 6.

In 1986, the Superior Court for the District of Columbia sentenced plaintiff  to a term of

44 years to life in Criminal Case No. F-1258-85.  Complaint at p. 1.

Plaintiff styles his action as a writ of mandamus to compel the BOP  "to provide him with

the necessary medication for Hepatitis C treatment."   Complaint at p. 1.  He contends BOP

officials have denied him necessary medication to treat his Hepatitis C condition.  Complaint at

p. 2.  Plaintiff thus contends that BOP officials have violated his Eighth Amendment rights.  *Id.*

at  p. 3.

Plaintiff seeks an order compelling the BOP to provide such treatment to plaintiff.

BACKGROUND

Inmate Monroe L. Coleman, Register Number 01723-016, the plaintiff in the above captioned action, arrived at USP Terre Haute on April 12, 2006. Dr. Webster assumed his care on November 20, 2006. Inmate Coleman's medical records indicate that on May 25, 2004, a test confirmed a diagnosis of Chronic Hepatitis C (genotype 1). Declaration of Thomas A. Webster, Clinical Director, at the United States Penitentiary (USP), Terre Haute, in Indiana (Webster Dec.) at ¶2.

Hepatitis C virus (HCV) is a single-stranded, enveloped, RNA virus with 6 genotypes and more than 50 subtypes. Genotype 1 is predominant in the United States. HCV is transmitted primarily by direct percutaneous exposures to infectious blood, such as through injection drug use or the transfusion of contaminated blood products (prior to July 1992). Most inmates diagnosed with HCV infection have behavioral risk factors for acquiring HCV and were infected prior to incarceration. Webster Dec. at ¶3.

Chronic HCV infection has an unpredictable course that is frequently characterized by fluctuations in ALT levels that may or may not be associated with significant liver disease. Approximately one-third of persons with chronic HCV infection have no laboratory or biopsy evidence of liver disease. An estimated 10-15 % of persons with chronic HCV infection develop progressive fibrosis of the liver leading to cirrhosis. High levels of alcohol consumption, older age at the time of infection, HIV infection, chronic HBV infection, and male gender increase the risk of disease progression. The degree of viremia ("viral load") and the HCV genotype, however, do not affect the progression of liver disease. The degree of ALT elevation does not strongly correlate with the risk of disease progression, but persons who develop cirrhosis are

4

more likely to have marked elevations in serum ALT levels. Once cirrhosis develops in persons

with chronic HCV infection, the risk of hepatocellular carcinoma (HCC) is about 1-4% per year.

*Id*. at ¶ 4.

The BOP Guidelines provide various treatment considerations to be used by its

personnel. *Id*. at ¶5. The Guidelines also set forth treatment contraindications and

considerations, including mental illness. *Id*. at ¶ 6.

The guidelines also require Genotype determination. *Id*. at ¶ 7. The Guidelines also

provide guidance for identifying candidates for liver biopsy. *Id*. at ¶ 8. The guidelines also set

forth criteria for prioritizing candidates for antiviral therapy. *Id*. at ¶ 9.

At the present time, the Terra Haute facility has approximately 400 inmates with

documented hepatitis C. This figure does not include the turnover in the population which at

least doubles that number. *Id*. at ¶ 10.

For patients with chronic hepatitis C (genotype 1), a biopsy of the liver is required by

BOP policy prior to treatment. Webster Dec. at ¶ 8. The biopsy is conducted at an outside

hospital. Because of the large number of Hepatitis C inmates requiring a biopsy at USP Terre

Haute, the patients are placed on a waiting list. Inmate Coleman must be cleared by the

psychiatry department before being placed on the waiting list for a liver biopsy. *Id*. at ¶11.

Based on BOP guidelines, inmate Coleman is not a priority candidate for antiviral

therapy because he does not have abnormal ALT values. On August 16, 2006, inmate Coleman

had a liver enzyme profile which revealed a normal liver enzyme level. The patient is scheduled to

have a follow up liver enzyme profile in February 2007. The liver enzyme profile test is provided to

inmates with hepatitis C in cycles of six months as a means to follow up on the progress of the

disease.  Mr. Coleman's medical records indicate that he has had a very prolonged period of

normal ALT.levels, in excess of a 24 month period, which would put him low on the priority list.

 Currently, Mr. Coleman is not in distress due to his hepatitis C condition.  *Id*. at ¶ 13.

Additionally, the ultrasound of Mr. Coleman's liver showed it to be normal.  *Id.* at ¶ 15.

Inmate Coleman also has contraindications for therapy because of his history of mental

illness.  *Id.* at ¶ 14.  His records reflect he has been diagnosed with major depressive disorder and

possible bipolar disorder.  He has been in therapy and received psychotropic medications in the

past. *Id.*   Inmate Coleman complains of "over-sleeping, hostile attitude, worrying, contemplating

early death, sometimes suicidal thoughts, unable to speak on the reactions caused by having the

disease, and lack of exercise or the drive to exercise."  Compl. at Section 2.  These complaints,

however,  can be attributed to his depression and bipolar disease.   His record reflects that in June

2005, inmate Coleman made a bonafide suicide attempt by hanging himself with his belt and

reported auditory hallucinations.  His record also shows a reported suicide gesture (cut wrists)

with reported auditory hallucinations in 1998, and another in 2000 (tried putting rope around

neck).  Inmate Coleman has gone through periods of noncompliance with the psychotropic

medications.  Webster Dec. at ¶ 14.

On May 3, 2006, plaintiff requested hepatitis A and hepatitis B vaccinations. On May 8,

2006, he was examined and the vaccinations were prescribed.  His name was placed on the list

for the vaccinations, and on July 11, 2006 he received the vaccination for hepatitis A.  He will

receive the vaccination for hepatitis B when his name reaches the top of the list.  In May, 2006,

plaintiff also complained that blood had not been drawn. Plaintiff's name was placed on the list

to have his blood tests drawn, and was told that blood would be drawn when his name reached

the top of the list.  Blood samples were drawn from plaintiff on August 14, 2006.  The test

yielded normal ALT levels.  Moreover, on August 8, 2006, he had been seen at the Infectious

Disease Chronic Care Clinic and had no complaints.  On December 8, 2006, plaintiff was seen

for his complaint of feeling bad when eating foods which contained salt.  He was referred for an

endoscopy and colonoscopy.   More recently, on January 29, 2007, the inmate underwent an

ultrasound of the liver, as follow up of his hepatitis C condition.  The liver was found to be

normal in size, no focal masses present, and there was no biliary ductal dilation.  *Id*. at ¶ 15.

**Informal resolution forms**

Plaintiff  arrived at USP Terre Haute on April 12, 2006.  Webster Dec. at ¶2.

On May 24, 2006, plaintiff made an informal complaint that he had been refused a

Hepatitis C vaccination.  Plumley Dec. at Ex 1.   He was advised by the Assistant Health

Services Administrator that "There is no such thing as a Hepatitis C Vaccination."  *Id*..[1]

On the same day, May 24, 2006, plaintiff filed another complaint which stated "Medical

staff has denied and refused to draw blood from this prisoner regarding chronic case."  *Id*. at Ex.

2.  On May 25, 2006, the assistant Health Administrator replied "You need to sign up for sick

call and be medically examined.  If Blood Test are indicated the MLP or MD can order them."

*Id.*

On May 30, 2006,  plaintiff made a complaint which stated "Intentional Preplanning

Homicide.  Complainant has been diagnosis with Hepatitis C which he is continuously sick but

---

[1]  *See* Ex. A, Article titled "Hepatitis C"  from FDA Consumer magazine, March-April
1999, at p. 1, http://www.fda.gov/fdac/features/1999/299_hepc.html ("Presently, there is no
vaccine or other means of preventing hepatitis C infection."); *accord* Ex.B, "Hepatitis"  http://
familydoctor.org at p. 3.

deprived of medication. . . ." *Id*. at Ex. 3.  The response was "You were examined by the staff physician 4/24/06." *Id.*

**Administrative Remedy # 415284**

By request dated June 5, 2006, plaintiff made the following request:

Medical staff only concerned about getting money from a D.C. prisoner.  Blood draw[] is for chronic case purposes and not for a $2.00 purpose.  Why hasn't blood been drawn from this prisoner?  When will he be scheduled for blood draw?

*Id.* at Ex. 4.1.  The Warden replied by response dated June 15, 2006:

An investigation of your request and a review of your medical record reveals that you arrived at USP Terre Haute on April 12, 2006.  You were examined by your primary Care Provider on April 24, 2006, who addressed your Chronic Care Clinic issues.  You were placed on the list to have blood tests drawn.  Once your name reaches the top of the list, the blood test will be collected.  You will not be charged a $2.00 co-pay fee for blood draws.

*Id.*  at Ex. 4.2.  Plaintiff made a Regional Administrative Remedy Appeal dated June 18, 2006 which stated:

Regardless, the BOP medical staff is aware that blood drawn is an essential issue to this matter which this chronic illness is worsening every day that passes shows intentional homicide. . . .

*Id.*  at Ex. 4.3.  The August 29, 2006 response to plaintiff's appeal stated:

You question why Health Services staff have not drawn blood to assess your chronic medical condition.  For relief, [you] request information pertaining to the schedule of future blood tests.

We have reviewed the documentation related to your appeal.  Your BOP providers are familiar with the requisite tests for the ongoing assessment and treatment of Hepatitis C.  The referenced waiting list ensures all inmates' needs are addressed in a fair and timely manner.  Based on the sound clinical judgment of your providers, and their knowledge of the BOP's Clinical Practice Guidelines for Hepatitis and the BOP's <u>Patient Care</u> policy (Program Statement 6013.01), we shall defer decisions to the local level.

*Id*.  at Ex. 4.4.  Plaintiff made a Central Office Administrative Remedy Appeal dated September

8

11, 2006, which claimed an Eighth Amendment violation and stated:

> BOP medical staff and administrative officials are intentionally awaiting for this inmate to get sicker before providing him with Hepatitis C medication promptly. This is an act of "deliberate indifference" when the disease can possibly to be put to sleep. What's the reason for waiting when he needs the medication now!

*Id.* at Ex. 4.5. The November 13, 2006 response to the appeal stated:

> . . . .You contend you have not had blood drawn to assess you chronic medical condition. Specifically, you request laboratory testing and medication for Hepatitis C.

> Our review of this matter reveals both the Warden and Regional Director have adequately addressed your concerns. Relevant portions of your medical record have been reviewed which reveal laboratory tests were performed on August 14, 2006. Results of these tests indicate you have hepatitis C. Medical staff follow the Bureau of Prisons' Clinical Practice Guidelines in the management and treatment of hepatitis C. Based upon your genotype, you meet the criteria for interval monitoring of lab work and clinical evaluation during chronic care visits. Hepatitis treatment decisions are made on a case-by-case basis in relation to objective clinical findings.

> It is evident you have received prompt, professional medical care consistent with reasonable community standards and Bureau of Prisons' policy.

*Id*. at Ex. 4.6.

**Administrative Remedy # 415820**

By request dated June 5, 2006, plaintiff requested:

> This prisoner has requested medications for Hepatitis C which BOP officials have refused and denied such treatment based on discriminatory or prejuicially (sic) reasons. This irresponsible act by BOP officials are resulting in intentional murder and neglect. . . .

*Id* at Ex. 5.1. The warden responded:

> An investigation of your request and review of your medical records reveals that you arrived at USP Terre Haute on April 12, 2006. You were medically examined by your Primary Care Provider on April 24, 2006, who addressed your Chronic Care Clinic issues. You were placed on the list to have blood tests drawn. Once

these teats have been completed and the results received, a treatment plan can be
discussed with your Primary Care Provider.

On May 3, 2006, you signed up for sick call and requested Hepatitis A and
Hepatitis B vaccinations. On May 8, 2006, you were examined by the Physician
Assistant who prescribed these two vaccinations. You have been placed on the
list for the vaccines. You will be placed on the call-out when your name reaches
the top of the list. At that time you will receive the Hepatitis A and Hepatitis B
vaccinations.

*Id.* at Ex. 5.2: 415820 response dated 6/15/06.

Plaintiff filed an administrative remedy appeal dated June 18, 2006, and a Central Office

Administrative Remedy Appeal on October 10, 2006. *Id.* at Ex. 5.3-5.5. The December 12,

2006 Response stated:

Relevant portions of your medical record have been reviewed which reveal you
have a history of hepatitis C. Your hepatitis C is a genotype 1, which does not
respond well to treatment. In addition, you have a history of bipolar disorder,
which increases your risk of negative side effects from the requested medication.
All these factors are carefully weighed before considering the nature and extent of
treatment for hepatitis C. Your diagnostic studies and clinical status do not meet
the criteria for initiation of treatment at this time. However, you will be
monitored in Chronic Care Clinic to assess the status of your disease on a regular
basis, treatment will be initiated when and if considered to be medically-indicated.

*Id.* at Ex.5.6.

**Administrative Remedy # 417019**

On June 16, 2006, plaintiff filed a request for administrative remedy concerning the $2.00

co-payment associated with his vaccination request. *Id.* at Ex. 6.1. His request was denied. *Id.*

at Ex. 6.2-6.4.

**Administrative Remedy # 435919**

On December 7, 2006, plaintiff filed a request for administrative remedy dated December

4, 2006. It states:

> Previously this prisoner has filed an Administrative Complaint (Nos. 415824-A1 & 415820-A2) which are pending before the BOP Central Office in Washington, D.C. However, this complaint concerns an emergency <u>biopsy for diagnosis of Hepatitis C.</u> A civil action . . . is pending in Washington, D.C. In accord with 18 U.S.C. §§ 4041-4042 the statutes mandate medical care to be provided by the Bureau of Prisons for this District of Columbia inmate. Any failure to comply with this request within 7 working days will result in the filing of the Civil Tort for "Negligence" ($1.5 million dollars) committed by prison officials and medical staff. . . .

*Id.* at Ex. 7.1. The Warden responded by response dated January 16, 2007:

> An investigation of your medical record and review of your request reveals that you have been diagnosed with chronic hepatitis C with genotype 1. Your liver enzymes were within normal limits. The Bureau of Prisons Clinical Practice Guidelines addresses and provides a guideline for the treatment of hepatitis C.

> Accordingly, you are receiving proper medical treatment for the aforementioned conditions.

> If your condition changes or you have questions regarding your care, please sign up through sick call to be re-evaluated by the physician assistant.

*Id.* at Ex. 7.2.

On February 5, 2007, plaintiff filed Document number 12 with the Court. It reflects that on January 26, 2007, plaintiff received a liver ultrasound. Document 12 at p. 1,4. It also reflects BOP's receipt from plaintiff of a tort claim for personal injury. Document 12 at p. 2 .

## ARGUMENT

**SERVICE OF PROCESS**

28 U.S.C. § 1361 permits the appropriate court to compel an officer or employee or agency of the United States to perform a duty to the plaintiff. In this case, the plaintiff's complaint named the United States as the sole defendant. In the body of the complaint, the plaintiff states that he is seeking to compel "the Federal Bureau of Prisons officials" to provide

11

petitioner with treatment. However, he fails to name those officials or designate them by

position. Plaintiff has not served the Bureau of Prisons, nor is there any evidence that he has

served any individuals in their individual or official capacities in this matter. *See* Lopez Dec.

Indeed, there is no evidence that plaintiff served the United States Attorney's Office since only

the copy forwarded from Superior Court was received. See Docket Document 1-1 at p.

4:Superior Court Order dated October 17, 2006.

Therefore, plaintiff's complaint should be dismissed pursuant to F.R.Civ. P. 12 (b)(4) and

(5).

**VENUE**

Title 28 U.S.C. § 1391 provides in pertinent part:

A civil action in which a defendant is an officer or employee of the United States
or any agency thereof acting in his official capacity or under color of legal
authority, or an agency of the United States, or the United States, may, except as
otherwise provided by law, be brought in any judicial district in which (1) a
defendant in the action resides, (2) a substantial part of the events or omissions
giving rise to the claim occurred, or a substantial part of property that is the
subject of the action is situated, or (3) the plaintiff resides if no real property is
involved in the action.

28 U.S.C. § 1391 (e). The alleged omissions of treatment leading to the filing of this lawsuit

took place in Terre Haute, Indiana. The medical personnel involved, the Warden, and the facility

in which plaintiff resides also are all in Indiana. Thus, the District Court for the District of

Columbia is not the proper venue for this matter, and the complaint should be dismissed pursuant

to F.R.Civ. P. 12 (b)(3).

Title 28 U.S.C. §1404(a) provides:

For the convenience of parties and witnesses, in the interest of justice, a district
court may transfer any civil action to any other district or division where it may

have been brought.

*Starnes v. McGuire*, 512 F.2d 918, 926 (D.C. Cir. 1974) (*en banc*) set out a number of factors for a district court to use in deciding whether to transfer a civil case brought by a prisoner incarcerated outside the District of Columbia. Those factors are: (1) the prisoner's difficulty of communication with counsel; (2) the difficulty of transferring the prisoner; (3) the availability of witnesses and files; (4) the speed of final resolution; and (5) whether the case involves issues of national policy that require the testimony of high-level administrators located in Washington, D.C. *Id*. 512 F.2d at 929-33.

Under that test, this action would most appropriately be brought in the District Court for the Southern District of Indiana, as plaintiff is currently housed at the USP Terre Haute, Indiana and the alleged denial of medical attention occurred in Indiana. The plaintiff's claims are individualized claims that are of no national import. The plaintiff's medical and prison records are at USP Terre Haute in Indiana. The staff involved in the provision of medical care to the plaintiff are also located in Indiana. These factors strongly support the appropriateness of transfer. To the extent that this case is able to survive the Government's dispositive motion, it would be most appropriately litigated (including discovery and any required hearings on factual issues) in the District Court for the Southern District of Indiana. Therefore, transfer under §1404(a) would be entirely appropriate, and serve the interests of both preservation of resources and justice.

**THERE IS NO EIGHTH AMENDMENT VIOLATION**

Plaintiff claims that the defendant has violated the Eighth Amendment because it has not given him treatment for his hepatitis C disease. The Supreme Court has established the

following test:

> We hold . . . that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994). *See Reed v. McBride*, 178 F.3d 849, 852 -853

(7th Cir.1999)("For Reed to avoid losing on summary judgment, he must show that these

"fail[ures] to provide for his basic human needs" were the result of a responsible prison official's

deliberate indifference to his serious medical conditions. *Farmer v. Brennan*, 511 U.S. 825, 834,

. . . (1994); *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th Cir.1999).

This entails satisfying a two-part test ("the Farmer test"): the plaintiff must show that 1) his

condition was objectively serious, and 2) state officials acted with the "requisite culpable state of

mind, deliberate indifference," which is a subjective standard. *Id.*")

A condition is objectively serious if "failure to treat [it] could result in further significant

injury or unnecessary and wanton infliction of pain." *Reed*, 178 F.3d at 852-853 *(citing Gutierrez*

*v. Peters*, 111 F.3d 1364, 1373 (7th Cir.1997)).

> [O]fficials are deliberately indifferent if they "know of and disregard an excessive risk to inmate health or safety." *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 591 (7th Cir.1999) (citation omitted). The plaintiff must show that the officials are "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must also draw the inference." *Id*. *quoting Farmer v. Brennan*, 511 U.S. 825, 837 . . . (1994). He must also show that the defendants acted with reckless disregard toward the serious need by "inaction or woefully inadequate action." *Hudson v. McHugh*, 148 F.3d 859, 863 (7th Cir.1998).

*Reed*, 178 F.3d at 852-853.

Plaintiff Coleman-Bey cannot meet the *Farmer* test for an Eighth Amendment violation.

14

The prison medical officials have not been deliberately indifferent to plaintiff's requests or to his condition, and they are not aware of facts from which an inference can be drawn that a substantial risk of serious harm exists.

Plaintiff asked for a hepatitis C vaccination. He was advised, correctly, that there is no hepatitis C vaccination. Ex. A at p. 1, Ex B at p. 3.

In May, 2006, plaintiff complained that blood had not been drawn. Ex. 2, 4.1. Plaintiff's name was placed on the list to have his blood tests drawn, and was told that blood would be drawn when his name reached the top of the list. Ex. 4.2 . In August, 2006, plaintiff's blood was drawn, relevant laboratory studies were performed and plaintiff's ADL levels were found to be within normal range. Webster Dec. at ¶15;  Ex. 4.6.

On May 3, 2006, plaintiff requested hepatitis A and hepatitis B vaccinations. Ex. 5.2. On May 8, 2006, he was examined and the vaccinations were prescribed. His name was placed on the list for the vaccinations. He received his hepatitis A vaccination on July 11, 2006. He will receive the hepatitis B vaccination when his name reaches the top of that list. Webster Dec. at ¶ 15.

By request dated December 4, 2006, plaintiff requested an "emergency biopsy for diagnosis of hepatitis C." Ex. 7.1. As is discussed below, plaintiff has failed to exhaust his administrative remedies concerning this request.

Plaintiff is one of many inmates at the Terra Haute prison who have hepatitis C. The liver enzyme profile test is provided to inmates with hepatitis C in cycles of six months as a means to follow up on the progress of the disease. Due to plaintiff's normal liver enzyme levels over a prolonged period of time, plus the ultra sound which showed plaintiff's liver to be normal,

there is no clear indication that failure to treat plaintiff's disease at this point could result in

further significant injury. Indeed the BOP Guidelines indicate

> Inmates with persistently normal ALT levels (at least 6 normal values evenly
> distributed over a 24-month period), and who have no other physical or laboratory
> evidence of chronic liver disease, were infected before the age of 35, and have no
> history of significant alcohol use, are at extremely low risk of severe liver disease.
> Most of these persons, when biopsied, have normal liver histology or minimal
> fibrosis and are deemed "slow progressors." Slow progressors advance only one
> Metavir stage in 15-20 years or more. . . .

> Deferring liver biopsy is reasonable for inmates with persistently normal ALT
> levels when the risk of liver disease is extremely low.

Webster Dec. at ¶ 8.

Additionally, plaintiff has a history of bi-polar disorder and depression–psychosis, which

increases his risk of negative side effects from the requested medication. Plumley Dec. at Ex.

5.6; Weber Dec. at ¶14; *See also* Ex. C, Mayo Clinic article at p. 2 ("Side effects from

interferon include flu-like symptoms, irritability, depression . . . . A small number of people

taking combined pegylated interferon and ribavirin may experience psychosis or suicidal

behavior. For this reason, treatment with interferon isn't recommended if you have a history of

uncontrolled major depression.")

Plaintiff was placed on the waiting lists for blood testing and vaccinations for Hepatitis A

and B. In January, 2007, plaintiff had an ultra sound of his liver. BOP guidelines require a liver

biopsy before treatment with interferon. Plaintiff must be cleared by Psychology Services prior

to being placed on the waiting list for biopsy. Webster Dec. at ¶ 11.

There is no proof that plaintiff's condition requires that he should be given any priority,

i.e. that his testing or access to treatment, be accelerated over that of other inmates on the lists.

16

Webster Dec. at ¶ 13.  In addition to the BOP Guidelines, a Mayo clinic article concerning

hepatitis C states:

> A diagnosis of HCV doesn't necessarily mean you need treatment.  The National
> Institutes of Heath recommends treatment for HCV if you have:
> - A positive test result indicating hepatitis C virus circulating in your
>   bloodstream
> - A biopsy that indicates significant liver damage
> - Elevated levels of a liver enzyme called alanine aminotransferase
>   (ALT) in your blood

> Even so, doctors continue to debate who needs treatment.  If you have only slight
> liver abnormalities, your doctor may decide against medical treatment because
> your long-term risk of developing a serious disease is slight, and the side effects
> of treatment can be severe.

Ex. A at p. 1.

Plaintiff merely disagrees with BOP medical personnel's assessment that "Your

diagnostic studies and clinical status do not meet the criteria for initiation of treatment **at this**

**time**." Plumley Dec.at Ex. 5.6 (Emphasis added.)  This disagreement is insufficient to establish

that defendant is acting  with deliberate indifference toward a serious medical need.  *See Handy*

*v. Price*,  996 F.2d 1064, 1067 -1068 (10th Cir.1993).

**PLAINTIFF IS NOT ENTITLED TO THE EXTRAORDINARY RELIEF OF
MANDAMUS**

Title 28 U.S.C. § 1361 reads as follows:

> The district courts shall have original jurisdiction of any action in the nature of
> mandamus to compel an officer or employee of the United States or any agency thereof to
> perform a duty owed to the plaintiff.

In determining whether the writ of mandamus is an appropriate relief, Courts have looked

at three criteria.  *Allied Chemical Corporation et al., v. Daiflon, Inc.*, 449 U.S. 333 (1980).  First,

the plaintiff must have a clear right to the relief sought; second, the defendant must have a clear

duty to act; and third, there must not exist other adequate relief available to the Plaintiff.

*Muhammad v. United States Bureau of Prisons*, 789 F.Supp. 449 (D.D.C. 1992);  *Council of and*

*for the Blind of Delaware County Valley Regan*, 709 F.2d 1521, 1533 (D.C.Cir.1993).

> The "law must not only authorize the demanded action, but require it; the duty must be clear and undisputable." *13th Regional Corp. v. U.S. Department of the Interior*, 654 F.2d 758, 760 (D.C.Cir.1980) *(quoting United States ex rel. McLennan v. Wilbur,* 283 U.S. 414, 420. . . (1931)).

*Miller v. U.S. Bureau of Prisons,*  1997 WL 135713, *2 (D.D.C.1997).

**The Plaintiff has no clear right to the relief sought**

The record shows that plaintiff has been placed on waiting lists for tests required prior to

treatment by interferon.  He has not been denied any right to treatment of his condition.  Rather,

he has been denied his request to accelerate himself to the head of the line.[2]

As is discussed above, the failure to treat plaintiff's disease **at this time** is not reckless

disregard toward a serious medical need, because his ALT levels have been normal for a

prolonged period of time, his liver ultra-sound was normal, and he is at risk of serious side

effects due to his history of mental illness.

**Defendant has no clear duty to provide plaintiff with the requested treatment at this time.**

The Supreme Court has established that:

> Under the established rule, the writ of mandamus cannot be made to serve the purpose of an ordinary suit.  It will issue only where the duty to be performed is ministerial and the obligation to act peremptory and plainly defined.  The law must not only authorize the demanded action, but require it; the duty must be clear and indisputable.

---

[2]  For inmates with Genotypes 2 and 3, liver biopsy can be deferred and antiviral therapy empirically initiated for certain inmates with genotypes 2 and 3 due to the high response rates to treatment for these patients.  Webster Dec. at  paragraph 8.

18

*U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931); *see Lozada Colon v. U.S. Dept. of State*, 170 F.3d 191 (D.C.Cir.1999) ("mandamus is only appropriate if 'the defendant owes [the plaintiff] a clear nondiscretionary duty'"), *cert. denied* 528 U.S.(1999), petition for rehearing denied 528 U.S. 1107(2000); *Weber v. U.S.*, 209 F.3d 756, 760 (D.C.Cir.2000)("The act of reporting recommendations, however, is highly discretionary and therefore far removed from the paradigm case for mandamus-a ministerial act that an agency has a clear duty to perform."). "A ministerial duty is one that admits of no discretion, so that the official has no authority to determine whether to perform the duty." *Kaufman v. Gonzalez*, 2006 WL 1725579, *3 (D.D.C.2006) *citing Swan v. Clinton*, 100 F.3d 973, 977 (D.C.Cir.1996).

Neither the BOP guidelines nor general medical consensus as reflected in the non-BOP literature attached as exhibits, indicate that plaintiff's current medical status requires that he be given treatment for Hepatitis C at this time. Plaintiff's liver profiles reveal that his enzymes have been at a normal level for over 24 months. His condition will be monitored by having a liver profile test every six months. His liver ultra sound was normal. Plaintiff's mental history indicates that he is at increased risk of negative side effects from the requested medication. Plaintiff's medical record does not indicate that he should be given priority over other inmates in need of the same tests and/or treatment. Thus, giving the requested treatment (and tests) is not a mere ministerial duty, but requires the medical assessment of the inmate's condition and the exercise of medical judgement and discretion concerning the need for treatment.

**WRIT OF MANDAMUS MAY NOT BE ISSUED WITHOUT MEETING SPECIFIC REQUIREMENTS OF THE PRISON LITIGATION REFORM ACT, 18 U.S.C. §3626(a)(1).**

The statute governing prospective relief[3] in the Prison Litigation Reform Act (PLRA), codified at 18 U.S.C §3626(a)(1), puts substantial limitations on the issuance of this type of relief.  Specifically, the Act provides

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C §3626(a)(1). Complaints about medical treatment in prison are complaints about "prison conditions."  *Witzke v. Femal*,  376 F.3d 744, 751 -752 (7th Cir.2004).

The PLRA mandates "that prospective relief will not be entered 'unless the court finds that such relief is narrowly drawn, extends no further than necessary .. and is the least intrusive means necessary to correct the violation of the Federal right.'" *Cason v. Seckinger.*  231 F.3d 777, 780 (11th Cir. 2000).  Here, no federal right was violated.

Additionally, granting plaintiff the relief requested would have an adverse impact on public safety and the operation of a criminal justice system.  Giving plaintiff priority over other inmates by moving him in front of them on waiting lists for vaccinations and medical tests or ordering that he be given treatment reasonably not considered necessary by medical personnel directly implicates this portion of the PLRA.  It will have an adverse impact on the BOP's

---

[3]The statute defines prospective relief as "all relief other than compensatory monetary damages."  18 U.S.C. §3626(g)(7).

authority to manage its inmate population and properly allocate the available resources.

The Court in *Thompson v. Gomez*, 993 F.Supp. 749, 754-5 (N.D.Cal.1997), *rev'd on other grounds in Gilmore v. People of the State of California*, 220 F.3d 987, 1005 (9th Cir. 2002) stated:

> The PLRA's prospective relief provisions unambiguously confine the power of federal courts to circumstances where prospective relief is necessary to correct specific violations of federal rights, and then to use only the least intrusive means necessary to correct such federal violations. For purposes of the PLRA's prospective relief provisions, 'federal rights' are limited to those rights created by federal law. The legislative reports on the bill reflect these Congressional intentions:
>
>> 'By requiring courts to grant or approve relief constituting the least intrusive means by curing an actual violation of a federal right, the provision stops judges from imposing remedies intended to effect an overall modernization of local prison systems or provide an overall improvement in prison conditions. The provision limits remedies to those necessary to remedy the proven violation of federal rights. The dictates of the provision are not a departure from current jurisprudence concerning injunctive relief [which provides that] ... injunctive relief must be no broader than necessary to remedy the constitutional violation.' H.R.Rep. No. 21, 104th Cong., 1st Sess., pt. 2, p. 34 (1995) (citations and quotations omitted).'

As is discussed above there is no Eighth Amendment right upon which to base any writ of mandamus in this case, and even if there were, the adverse impact upon the provision of health care to other prisoners and the operation of the federal criminal justice system outweighs any equities in favor of the plaintiff. Plaintiff's medical condition is being properly monitored at USP Terre Haute. His disagreement with the manner in which his access to tests, and ultimately treatment, is prioritized does not give rise to a cause of action under the Eight Amendment. Until completion of his biopsy, it would be counterproductive to provide him with medical treatment which may not be necessary at this time and which carries an increased risk of negative side effects for this particular patient.

**Plaintiff Did Not Exhaust the Bureau of Prisons' Administrative Remedy**
**Process for Administrative Remedy Numbers 417019 and 435919**

The Bureau of Prisons has an internal three-level grievance mechanism through which

inmates confined in institutions operated by the Bureau must exhaust before bringing an action in

federal court.  *See* 28 C.F.R. §§ 542.10 *et seq.*  This administrative remedy process is a method by

which an inmate may seek formal review of a complaint related to any aspect of his

imprisonment.   Should the inmate's complaint be denied by the institution, an inmate can appeal

the decision by filing the complaint with the Regional Office of the Bureau of Prisons.  If the

Regional Office denies the complaint, the inmate can appeal the decision to the Office of the

General Counsel in Washington, D.C.  Should the decision be denied by the General Counsel, the

inmate may then file a court action.

Pursuant to the Prison Litigation Reform Act (PLRA), an inmate complaining about any

aspect of his conditions of confinement must complete any prison administrative process capable

of addressing the inmate's complaint and providing some form of relief prior to suing over prison

conditions.  *See* 42 U.S.C. § 1997e(a); *Booth v. Churner*, 532 U.S. 731, 739 (2001); *Porter v.*

*Nussle*, 534 U.S. 516, 530 (2002); *Jackson v. District of Columbia*, 254 F.3d 262, 269 (D.D.Cir.

2001).  The PLRA's exhaustion requirement applies to all inmate suits about prison life, and

includes Plaintiff's claims concerning medical treatment under Eighth Amendment. *Witzke v.*

*Femal,*  376 F.3d 744, 751 -752 (7th Cir. 2004).

Because exhaustion is a prerequisite to filing suit, it is incumbent upon Plaintiff to allege

and to show the court he has exhausted each and every claim contained in the complaint.  *Steele v.*

*Fed'l Bureau of Prisons*, 355 F.3d 1204, 1209-11 (10th Cir. 2003).  Specifically, "To ensure

compliance with the statute, a prisoner must provide a comprehensible statement of his claim and also either attach copies of administrative proceedings or describe their disposition with specificity." *Id.* at 1211. In this case, Plaintiff did not demonstrate that he exhausted his administrative remedies concerning his request for an emergency biopsy, case number 435919. Plaintiff filed the instant complaint on October 31, 2006. Plaintiff's request for an emergency biopsy was made on December 7, 2006. Ex. 7.1. He received a response from the Warden dated January 16, 2007. Ex. 7.2 No appeal is reflected in his file. Plumley Dec. at ¶8. Plaintiff also did not appeal his case number 417019. *Id.* at ¶7.

Therefore, dismissal is mandated to the extent relief is requested concerning the allegations in those two cases. *Porter*, 534 U.S. at 526-7; *Booth*, 523 U.S. at 739; *Jackson*, 254 F.3d at 269; *In re Smith*, 114 F.3d 1247, 1250 (D.C.Cir.1997).

**CONCLUSION**

For the reasons explained above, plaintiff's motion for a writ of mandamus should be dismissed, or in the alternative should be transferred to the District Court for the Southern District of Indiana.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____
RUDOLPH  CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| MONROE L. COLEMAN-BEY ) | |
| ) | |
| Plaintiff, ) | Civil Action No.: 06-1855 (JDB) |
| ) | |
| v. ) | |
| ) | |
| United States of America ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

STATEMENT OF MATERIAL FACTS

Defendant respectfully submits this statement of material facts as to which there is no genuine issue.

1    Inmate Coleman's medical records indicate that on May 25, 2004, a test confirmed a diagnosis of Chronic Hepatitis C (genotype 1). Webster Dec. at ¶2.

2    The BOP Guidelines provide the following treatment considerations:

Treatment considerations: Treating physicians should weigh the following factors in assessing the appropriateness of treatment and the best timing for initiating treatment as they counsel inmates with chronic HCV infection:

• Only 10-15 % of persons with HCV infection develop significant long term complications of liver disease, usually 20-30 years after initial infection.

• No laboratory parameters definitively predict which persons infected with HCV will develop cirrhosis or will respond to medical therapy.

• The presence of moderate to severe fibrosis (Metavir >_ stage 2 or Ishak >_ stage 3) on liver biopsy is currently the best marker for determining who should be offered antiviral therapy for hepatitis C.

1

• The combination of a pegylated interferon plus ribavirin is significantly more effective in clearing viremia and establishing sustained viral response rates (SVR) than prior treatment regimens.

•Although current antiviral therapy is usually well tolerated, serious drug side effects may occur.

•Future treatments for hepatitis C may be more effective and more easily tolerated.

*Id*. at ¶ 5.

3.     The Guidelines also set forth treatment contraindications and considerations, including

mental illness:

Inmates with chronic HCV infection who are potential candidates for antiviral therapy should first be assessed for absolute or relative treatment contraindications as listed in Appendix 9 (Contraindications to Interferon or Ribavirin Therapy). Inmates with contraindications to antiviral therapy should not be treated with interferon and ribavirin as long as the contraindication exists.

The following co-morbidities, although not absolute contraindications, should be carefully evaluated prior to initiating antiviral therapy:

•Mental illness: Inmates with a history of psychiatric illness or with signs or symptoms of mental illness should be referred to a psychologist or psychiatrist for assessment. Inmates with serious mental illness should be treated and stabilized prior to pursuing a further work-up for treatment.

*Id.* at ¶ 6.

The guidelines also require Genotype determination:

The HCV genotype markedly affects treatment response. Persons with genotypes 2 or 3 have a 76-82 % response rate to pegylated interferon/ribavirin therapy, compared to persons with genotype 1 who have a 40-45 % response rate. The HCV genotype must be determined prior to pursuing treatment, since the genotype will affect patient counseling, the evaluation strategy, the decision to treat for a subset of patients, and the recommended drug regimen. Once the HCV genotype has been determined in a specific patient, serial genotype testing is not indicated unless re-infection is suspected, since HCV genotypes do not change during the course of an infection.

*Id.* at ¶ 7.

The Guidelines also provide the following guidance for Identifying candidates for liver

biopsy.

> Liver biopsy is the best means of staging liver disease in patients with chronic
> hepatitis C and may identify other etiologies of chronic liver disease, such as
> autoimmune hepatitis, alcoholic liver disease, Wilson's disease, and
> hemochromatosis. Determining the degree of liver disease is particularly important
> for those inmates who may wish to defer treatment if they have normal liver
> histology or minimal fibrosis, as well as in cases where relative contraindications
> to treatment exist, i.e., psychiatric and substance abuse disorders not in full
> remission, and medical conditions such as diabetes or cardiovascular disease which
> are not fully controlled. The following guidance should be considered when
> determining the need for liver biopsy:

> •ALT levels: The decision to obtain a liver biopsy should not be strongly based on
> ALT levels; however, ALT levels are a relevant factor that warrant monitoring and
> review. The greater the ALT level, the more likely it is that a person has significant
> liver disease; therefore, inmates with markedly elevated ALT levels should be
> prioritized for liver biopsy. However, even persons with normal ALT levels may
> have liver disease and should be evaluated for liver biopsy since a small, but
> significant percentage (14-24 %) of persons with normal ALT levels have more
> than portal fibrosis (Metavir >_ stage 2).

> Inmates with persistently normal ALT levels (at least 6 normal values evenly
> distributed over a 24-month period), and who have no other physical or laboratory
> evidence of chronic liver disease, were infected before the age of 35, and have no
> history of significant alcohol use, are at extremely low risk of severe liver disease.
> Most of these persons, when biopsied, have normal liver histology or minimal
> fibrosis and are deemed "slow progressors." Slow progressors advance only one
> Metavir stage in 15-20 years or more. Women who are slow progressors are
> especially unlikely to develop severe liver disease during their lifetime.

> Deferring liver biopsy is reasonable for inmates with persistently normal ALT
> levels when the risk of liver disease is extremely low. Chronic HCV infection
> should still be confirmed in such cases with a quantitative HCV RNA test, and if
> negative, should be repeated with a qualitative nucleic acid test to diagnose
> resolved HCV infection. Inmates with confirmed HCV infection and normal ALT
> levels should be monitored with a targeted history and physical examination every
> 6-12 months, along with a platelet count, AST, ALT, alkaline phosphatase and
> prothrombin time measurements.

A decreased platelet count, an increase in the AST/ALT ratio, and a prolonged prothrombin time are the earliest indicators of cirrhosis and portal hypertension and warrant an aggressive evaluation for liver disease.

•Genotypes 2 and 3: Liver biopsy can be deferred and antiviral therapy empirically initiated for certain inmates with genotypes 2 and 3 due to the high response rates to treatment for these patients. All inmates with HCV genotypes 2 or 3, however, should be advised of the potential toxicity of interferon and ribavirin and offered liver biopsy to help determine the urgency of therapy. Other inmates, with relative contraindications to antiviral therapy, or in whom other causes of liver disease are suspected, or who have evidence of severe liver disease on physical examination or laboratory testing, should have a liver biopsy to help guide treatment decision-making.

•Genotypes 1, 4, 5, and 6: Liver biopsy is generally indicated for all inmates with these genotypes, since treatment is less effective in these patients. Treatment without liver biopsy may be considered for inmates with suspected compensated cirrhosis, or with certain extrahepatic manifestations of HCV infection.

* * *

*Id*. at ¶ 8.

4    The guidelines also set forth criteria for prioritizing candidates for antiviral therapy:

Inmates with the following criteria are priority candidates for antiviral therapy based on evidenced-based data and the American Association for the Study of Liver Diseases (AASLD) recommendations:

•abnormal serum ALT values;

•liver biopsy with chronic hepatitis with significant fibrosis (more than portal fibrosis: Metavir >_ stage 2 or Ishak >- stage 3);

•compensated liver disease (total bilirubin < 1.5 g/dL; INR < 1.5; albumin > 3.4 g/dL; platelet count > 75,000/mm3; and no evidence of hepatic encephalopathy or ascites;

•acceptable pre-treatment labs: hemoglobin > 13 g/dL in men or > 12 g/dL in women; absolute neutrophil count > 1500/mm3; creatinine < 1.5 mg/dL; and

•inmate is willing to be treated and conform to treatment requirements, including abstinence from alcohol and illicit drugs.

> Hepatitis C treatment should be deferred in inmates with early hepatic fibrosis who have relative contraindications to antiviral therapy, until these complicating conditions are resolved. Conversely, antiviral therapy should be considered in inmates with stage 3 or 4 fibrosis despite the presence of relative contraindications. If treatment is pursued for such individuals, the inmate must be counseled on the increased risk of side effects, and/or the potential for exacerbations in medical or psychiatric illnesses.

*Id*. at ¶ 9.

5.    The biopsy is conducted at an outside hospital.  Because of the large number of Hepatitis C inmates requiring a biopsy at USP Terre Haute, the patients are placed on a waiting list.   Inmate Coleman must be cleared by Psychology Services prior to being placed on the waiting list for a liver biopsy. *Id.* at ¶ 11.

6.    On August 16, 2006, inmate Coleman had a liver enzyme profile which revealed a normal liver enzyme level.  The patient is scheduled to have a follow up liver enzyme profile in February 2007.  The liver enzyme profile test is provided to inmates with hepatitis C in cycles of six months as a means to follow up on the progress of the disease.  Mr. Coleman's medical records indicate that he has had a very prolonged period of normal ALT levels, in excess of a 24 month period, which would put him low on the priority list. *Id*. at ¶ 13.

7    Inmate Coleman also has contraindications for therapy because of his history of mental illness.  His records reflect he has been diagnosed with major depressive disorder and possible bipolar disorder.  He has been in therapy and received psychotropic medications in the past.  His record reflects that in June 2005, inmate Coleman made a bonafide suicide attempt by hanging himself with his belt and reported auditory hallucinations.  His record also shows a reported suicide gesture (cut wrists) with reported auditory hallucinations in 1998, and another in 2000 (tried putting rope around neck).  Inmate Coleman has gone through periods of noncompliance

5

with the psychotropic medications.  *Id*. at ¶ 14.

8.       On May 3, 2006, plaintiff requested hepatitis A and hepatitis B vaccinations. On May 8, 2006 he was examined and the vaccinations were prescribed.  His name was placed on the list for the vaccinations, and on July 11, 2006 he received the vaccination for hepatitis A.  He will receive the vaccination for hepatitis B when his name reaches the top of the list.  In May, 2006, plaintiff also complained that blood had not been drawn. Plaintiff's name was placed on the list to have his blood tests drawn, and was told that blood would be drawn when his name reached the top of the list.  Blood samples were drawn from plaintiff on August 14, 2006.  The test yielded normal ALT levels.  On January 29, 2007, the plaintiff underwent an ultrasound of the liver, as follow up of his hepatitis C condition.  The liver was found to be normal in size, no focal masses present, and there was no biliary ductal dilation.  *Id*. at ¶ 15.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____
RUDOLPH  CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

6

CERTIFICATE OF SERVICE

On this 20th day of February, 2007, the foregoing motion to dismiss or in the alternative for summary judgment was served by prepaid first class mail to:

MONROE L. COLEMAN-BEY
     #01723-016
     U.S. Penitentiary
     P.O. Box 12015
     Terre Haute, IN 47801

_____
Rhonda C. Fields
Assistant United States Attorney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MONROE L. COLEMAN-BEY )
)
Plaintiff, )
)                    Civil Action No.: 06-1855 (JDB)
v. )
)
United States of America )
)
Defendant. )
)

## DECLARATION OF THOMAS A. WEBSTER

1.      I am employed by the United States Department of Justice, Federal Bureau of Prisons as the Clinical Director, at the United States Penitentiary (USP), Terre Haute, in Indiana. I am a licensed physician in the state of Indiana. I have been employed with the Federal Bureau of Prisons since 1997.

2.      Inmate Monroe L. Coleman, Register Number 01723-016, the Plaintiff in the above captioned action, arrived at USP Terre Haute on April 12, 2006. I assumed his care on November 20, 2006. Inmate Coleman's medical records indicate that on May 25, 2004, a test confirmed a diagnosis of Chronic Hepatitis C (genotype 1).

3.      Hepatitis C virus (HCV) is a single-stranded, enveloped, RNA virus with 6 genotypes and more than 50 subtypes. Genotype 1 is predominant in the United States. HCV is transmitted primarily by direct percutaneous exposures to infectious blood, such as through injection drug use or the transfusion of contaminated blood products (prior to July 1992). *See* Federal Bureau of Prisons Clinical Practice Guidelines, Prevention and Treatment of Viral Hepatitis ("Guidelines") at p. 20. Most inmates diagnosed with HCV infection have behavioral risk factors for acquiring HCV and were infected prior to incarceration. *Id.* at p. 21.

4.      Chronic HCV infection has an unpredictable course that is frequently

characterized by fluctuations in ALT levels that may or may not be associated with significant liver disease. Approximately one-third of persons with chronic HCV infection have no laboratory or biopsy evidence of liver disease.  An estimated 10-15 % of persons with chronic HCV infection develop progressive fibrosis of the liver leading to cirrhosis.  High levels of alcohol consumption, older age at the time of infection, HIV infection, chronic HBV infection, and male gender increase the risk of disease progression.  The degree of viremia ("viral load") and the HCV genotype, however, do not affect the progression of liver disease.  The degree of ALT elevation does not strongly correlate with the risk of disease progression, but persons who develop cirrhosis are more likely to have marked elevations in serum ALT levels.  Once cirrhosis develops in persons with chronic HCV infection, the risk of hepatocellular carcinoma (HCC) is about 1-4% per year.  *Id.* at p. 25.

    5.     The BOP Guidelines provide the following treatment considerations: Treatment considerations: Treating physicians should weigh the following factors in assessing the appropriateness of treatment and the best timing for initiating treatment as they counsel inmates with chronic HCV infection:

● Only 10-15 % of persons with HCV infection develop significant long term complications of liver disease, usually 20-30 years after initial infection.

● No laboratory parameters definitively predict which persons infected with HCV will develop cirrhosis or will respond to medical therapy.

● The presence of moderate to severe fibrosis (Metavir >_ stage 2 or Ishak >_ stage 3) on liver biopsy is currently the best marker for determining who should be offered antiviral therapy for hepatitis C.

● The combination of a pegylated interferon plus ribavirin is significantly more effective in clearing viremia and establishing sustained viral response rates (SVR) than prior treatment regimens.

●Although current antiviral therapy is usually well tolerated, serious drug side effects may occur.

●Future treatments for hepatitis C may be more effective and more easily

tolerated.

*Id.* at p. 27.

6.    The Guidelines also set forth treatment contraindications and considerations, including mental illness:

Inmates with chronic HCV infection who are potential candidates for antiviral therapy should first be assessed for absolute or relative treatment contraindications as listed in Appendix 9 (Contraindications to Interferon or Ribavirin Therapy). Inmates with contraindications to antiviral therapy should not be treated with interferon and ribavirin as long as the contraindication exists.

The following co-morbidities, although not absolute contraindications, should be carefully evaluated prior to initiating antiviral therapy:

• Mental illness: Inmates with a history of psychiatric illness or with signs or symptoms of mental illness should be referred to a psychologist or psychiatrist for assessment. Inmates with serious mental illness should be treated and stabilized prior to pursuing a further work-up for treatment.

*Id.* at p. 27, and see *id.* at p. 31.

7.    The guidelines also require Genotype determination:

The HCV genotype markedly affects treatment response. Persons with genotypes 2 or 3 have a 76-82 % response rate to pegylated interferon/ribavirin therapy, compared to persons with genotype 1 who have a 40-45 % response rate. The HCV genotype must be determined prior to pursuing treatment, since the genotype will affect patient counseling, the evaluation strategy, the decision to treat for a subset of patients, and the recommended drug regimen. Once the HCV genotype has been determined in a specific patient, serial genotype testing is not indicated unless re-infection is suspected, since HCV genotypes do not change during the course of an infection.

*Id.* at p. 28.

8.    The Guidelines also provide the following guidance for Identifying candidates for liver biopsy.

Liver biopsy is the best means of staging liver disease in patients with chronic hepatitis C and may identify other etiologies of chronic liver disease, such as autoimmune hepatitis, alcoholic liver disease, Wilson's disease, and hemochromatosis. Determining the degree of liver disease is particularly important for those inmates who may wish to defer treatment if they have normal

liver histology or minimal fibrosis, as well as in cases where relative contraindications to treatment exist, i.e., psychiatric and substance abuse disorders not in full remission, and medical conditions such as diabetes or cardiovascular disease which are not fully controlled. The following guidance should be considered when determining the need for liver biopsy:

● ALT levels: The decision to obtain a liver biopsy should not be strongly based on ALT levels; however, ALT levels are a relevant factor that warrant monitoring and review. The greater the ALT level, the more likely it is that a person has significant liver disease; therefore, inmates with markedly elevated ALT levels should be prioritized for liver biopsy. However, even persons with normal ALT levels may have liver disease and should be evaluated for liver biopsy since a small, but significant percentage (14-24 %) of persons with normal ALT levels have more than portal fibrosis (Metavir >_ stage 2).

Inmates with persistently normal ALT levels (at least 6 normal values evenly distributed over a 24-month period), and who have no other physical or laboratory evidence of chronic liver disease, were infected before the age of 35, and have no history of significant alcohol use, are at extremely low risk of severe liver disease. Most of these persons, when biopsied, have normal liver histology or minimal fibrosis and are deemed "slow progressors." Slow progressors advance only one Metavir stage in 15-20 years or more. Women who are slow progressors are especially unlikely to develop severe liver disease during their lifetime.

Deferring liver biopsy is reasonable for inmates with persistently normal ALT levels when the risk of liver disease is extremely low. Chronic HCV infection should still be confirmed in such cases with a quantitative HCV RNA test, and if negative, should be repeated with a qualitative nucleic acid test to diagnose resolved HCV infection. Inmates with confirmed HCV infection and normal ALT levels should be monitored with a targeted history and physical examination every 6-12 months, along with a platelet count, AST, ALT, alkaline phosphatase and prothrombin time measurements.

A decreased platelet count, an increase in the AST/ALT ratio, and a prolonged prothrombin time are the earliest indicators of cirrhosis and portal hypertension and warrant an aggressive evaluation for liver disease.

● Genotypes 2 and 3: Liver biopsy can be deferred and antiviral therapy empirically initiated for certain inmates with genotypes 2 and 3 due to the high response rates to treatment for these patients. All inmates with HCV genotypes 2

or 3, however, should be advised of the potential toxicity of interferon and ribavirin and offered liver biopsy to help determine the urgency of therapy. Other inmates, with relative contraindications to antiviral therapy, or in whom other causes of liver disease are suspected, or who have evidence of severe liver disease on physical examination or laboratory testing, should have a liver biopsy to help guide treatment decision-making.

●Genotypes 1, 4, 5, and 6: Liver biopsy is generally indicated for all inmates with these genotypes, since treatment is less effective in these patients. Treatment without liver biopsy may be considered for inmates with suspected compensated cirrhosis, or with certain extrahepatic manifestations of HCV infection.

* * *

*Id.* at p. 28-29.

9.    The guidelines also set forth criteria for prioritizing candidates for antiviral therapy:

Inmates with the following criteria are priority candidates for antiviral therapy based on evidenced-based data and the American Association for the Study of Liver Diseases (AASLD) recommendations:

●abnormal serum ALT values;

●liver biopsy with chronic hepatitis with significant fibrosis (more than portal fibrosis: Metavir >_ stage 2 or Ishak >- stage 3);
●compensated liver disease (total bilirubin < 1.5 g/dL; INR < 1.5; albumin > 3.4 g/dL; platelet count > 75,000/mm3; and no evidence of hepatic encephalopathy or ascites;

●acceptable pre-treatment labs: hemoglobin > 13 g/dL in men or > 12 g/dL in women; absolute neutrophil count > 1500/mm3; creatinine < 1.5 mg/dL; and

●inmate is willing to be treated and conform to treatment requirements, including abstinence from alcohol and illicit drugs.

Hepatitis C treatment should be deferred in inmates with early hepatic fibrosis who have relative contraindications to antiviral therapy, until these complicating

FEB-20-2007 03:22P FROM:
TO:92023054577    P.6
Thomas Webster Order 2004.wpd 1855-JDB    Document 14-2    Filed 02/20/2007    Page 6 of 8

Page 6

conditions are resolved. Conversely, antiviral therapy should be considered in inmates with stage 3 or 4 fibrosis despite the presence of relative contraindications. If treatment is pursued for such individuals, the inmate must be counseled on the increased risk of side effects, and/or the potential for exacerbations in medical or psychiatric illnesses.

*Id.* at p. 30.

10.    At the present time the Terra Haute facility has approximately 400 inmates with documented hepatitis C. This figure does not include the turnover in the population which at least doubles that number.

11.    As is indicated above, for patients with chronic hepatitis C (genotype 1), a biopsy of the liver is required by BOP policy prior to treatment. The biopsy is conducted at an outside hospital. Because of the large number of Hepatitis C inmates requiring a biopsy at USP Terre Haute, the patients are placed on a waiting list. Inmate Coleman must be cleared by Psychology Services prior to being placed on the waiting list.

12.    Inmate Coleman arrived at USP Terre Haute on April 12, 2006. On April 24, 2006, inmate Coleman had a follow up visit at the Infectious Disease Chronic Care Clinic and had no complaints regarding this condition.

13.    Based on BOP guidelines, inmate Coleman is not a priority candidate for antiviral therapy because he does not have abnormal ALT values. *See Id.* at p. 30. On August 16, 2006, inmate Coleman had a liver enzyme profile which revealed a normal liver enzyme level. The patient is scheduled to have a follow up liver enzyme profile in February 2007. The liver enzyme profile test is provided to inmates with hepatitis C in cycles of six months as a means to follow up on the progress of the disease. Mr. Coleman's medical records indicate that he has had a very prolonged period of normal ALT levels, in excess of a 24 month period, which would put him low on the priority list. Currently, Mr. Coleman is not in distress due to his hepatitis C condition.

14.    Inmate Coleman also has contraindications for therapy because of his history of

mental illness. His records reflect he has been diagnosed with major depressive disorder and possible bipolar disorder. He has been in therapy and received psychotropic medications in the past. Inmate Coleman complains of "over-sleeping, hostile attitude, worrying, contemplating early death, sometimes suicidal thoughts, unable to speak on the reactions caused by having the disease, and lack of exercise or the drive to exercise." Compl. at Section 2. These complaints, however, can be attributed to his depression and bipolar disease. Indeed, on August 8, 2006, he was seen at the Infectious Disease Chronic Care Clinic and had no medical complaints. His record reflects that in June 2005, inmate Coleman made a bonafide suicide attempt by hanging himself with his belt and reported auditory hallucinations. His record also shows a reported suicide gesture (cut wrists) with reported auditory hallucinations in 1998, and another in 2000 (tried putting rope around neck). Inmate Coleman has gone through periods of noncompliance with the psychotropic medications.

15.     On May 3, 2006, plaintiff requested hepatitis A and hepatitis B vaccinations. On May 8, 2006, he was examined and the vaccinations were prescribed. His name was placed on the list for the vaccinations, and on July 11, 2006 he received the vaccination for hepatitis A. He will receive the vaccination for hepatitis B when his name reaches the top of the list. In May, 2006, plaintiff also complained that blood had not been drawn. Plaintiff's name was placed on the list to have his blood tests drawn, and was told that blood would be drawn when his name reached the top of the list. Blood samples were drawn from plaintiff on August 14, 2006. The test yielded normal ALT levels. Moreover, on August 8, 2006, he had been seen at the Infectious Disease Chronic Care Clinic and had no complaints. On December 8, 2006, plaintiff was seen for his complaint of feeling bad when eating foods which contained salt. He was referred for an endoscopy and colonospy. More recently, on January 29, 2007, the inmate underwent an ultrasound of the liver, as follow up of his hepatitis C condition. The liver was found to be normal in size, no focal masses present, and there was no biliary ductal dilation. Thus, the liver is essentially normal at this time.

    I declare under penalty of perjury that the foregoing is true and accurate to the best of my

knowledge.

Executed this _20_ day of February, 2007.

Thomas Webster, MD
Clinical Director
United States Penitentiary
Terre Haute

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MONROE L. COLEMAN-BEY,               )
      Plaintiff,               )
                           )
                           )
      v.                             )     CIVIL ACTION 06-1855
                           )
FEDERAL BUREAU OF PRISONS, et al., )
      Defendants.              )
_____)

## DECLARATION OF BRUCE PLUMLEY

In accordance with 28 U.S.C. § 1746, I, Bruce Plumley, make the following unsworn declaration, under penalty of perjury, pertinent to the above styled and numbered cause:

1.   I am an administrative Remedy Specialist for the Federal Bureau of Prisons (BOP) in Washington, D.C., and have been employed with the BOP since April 4, 2004.

2.   The Bureau of Prisons administrative remedy procedure is set out at 28 C.F.R. §542.10 et seq., and provides formal review of any complaint which relates to any aspect of the inmate's confinement. Under this process, inmates are encouraged to first attempt resolution of their complaints informally by discussing the matter with a member of their Unit Team. A record of that attempt is signed by the inmate and a member of the Unit Team. If informal resolution is insufficient to resolve the matter, the inmate may file a formal complaint with the Warden within fifteen days of the date on which the basis of the

complaint occurred.  28 C.F.R. §542.13.  If the inmate is not satisfied with the Warden's response, he or she may appeal the response to the Regional Director.  If the inmate is dissatisfied with the regional response, he or she may file a national appeal with the Office of General Counsel in Washington, D.C.  28 C.F.R. §542.14.  Appeal to the Office of General Counsel is the final administrative appeal in the Bureau of Prisons.

3.  As Administrative Remedy Specialist, I have access to the BOP database known as SENTRY.  All administrative remedy requests and appeals filed by Bureau of Prisons' inmates are logged and maintained in SENTRY.

4.  I have reviewed the administrative remedy requests filed by the Plaintiff Monroe Coleman, Register Number 01723-016.

5.  The Plaintiff initially submitted an Informal Resolution form dated May 24, 2006, requesting a hepatitis C vaccination.  This matter could not be resolved as health services staff explained there is no hepatitis C vaccination.

On June 7, 2006, Plaintiff submitted a Request for Administrative Remedy (BP-9) 415820-F1 dated June 5, 2006, in which he requested treatment for hepatitis C.  On June 16, 2006, a response denying this request was issued explaining that he had been treated appropriately for his condition and that he had been placed in the waiting list for hepatitis A and hepatitis B vaccinations.

On June 26, 2006, Plaintiff submitted a Regional Administrative Remedy Appeal (BP-10) 415820-R1 dated June 18, 2006.  On August 28, 2006, a response was issued explaining that health services had been providing him with essential medical care.

On October 10, 2006, Plaintiff submitted a Central Office Remedy Appeal (BP-11) 415820 dated September 27, 2006.  On December 27, 2006, a response was issued explaining that the plaintiff's test results and clinical status do not meet the criteria for initiation of treatment, but his condition would continue to be monitored.  The Plaintiff exhausted the administrative remedy procedures with regard to this request.

6.    Plaintiff submitted an Informal Resolution Form dated May 24, 2006, complaining that medical staff refused to draw his blood.  Medical staff advised the inmate to sign up for sick call to be medically examined.

On June 7, 2006, Plaintiff submitted a separate BP-9, number 415824-F1 dated June 5, 2006, in which he requested blood testing for hepatitis C and complained about the $2.00 copay charged to his account.  On June 15, 2006, a response was issued which explained that plaintiff had been placed on the waiting list to have his blood drawn and there would be no copay fee charged to him.

On June 26, 2006, Plaintiff submitted a BP-10 415824-R1 dated June 18, 2006.  On August 29, 2006, a response was issued

deferring to the institution's response.

On September 20, 2006, Plaintiff submitted a BP-11 415824-A1 dated September 11, 2006. On November 13, 2006, a response was issued explaining the inmate had received adequate and prompt medical care. The plaintiff exhausted the administrative remedies regarding this request.

7.  Plaintiff submitted an Informal Resolution Form dated May 30, 2006, in which he complained about being continuously sick from hepatitis C and not receiving medications. Medical staff had already seen the inmate.

On June 16, 2006, Plaintiff submitted BP-9 417019-F1 dated June 15, 2006, in which he complained about the BOP taking money from his account due to his request to be tested for hepatitis C. On July 7, 2006, a response was issued explaining the copay fee was charged as he initiated the health care visit.

On July 27, 2006, the Plaintiff submitted a BP-10 417019-R1 dated July 23, 2006. On September 28, 2006, a response to this BP-10 was issued denying his appeal.

A review of the administrative remedy record reflects that plaintiff has not appealed at the central office level and, therefore, has not exhausted his administrative remedies regarding remedy number 417019.

8.  On December 7, 1006, Plaintiff submitted BP-9 435919-F1 dated December 4, 2006, in which he expressed concern about getting an emergency biopsy for the diagnosis of hepatitis C. On

January 16, 2007, a response was issued explaining that although
he was diagnosed with hepatitis C, his liver enzymes were within
normal levels, and his care was in accordance with the Bureau of
Prisons Clinical Practice Guideline.  To this date, the plaintiff
has not filed an appeal regarding this request.


     In accordance with 28 U.S.C. § 1746, I hereby declare under
penalty of perjury that the foregoing is true and correct.


Dated: _20Feb07_                    _____
                                    BRUCE PLUMLEY
                                    Administrative Remedy Specialist
                                    Office of General Counsel

Attachment 1
Page 2 (front)
THA-1330.13B

## U. S. PENITENTIARY/FEDERAL PRISON CAMP

Terre Haute, Indiana

### INFORMAL RESOLUTION FORM

Bureau of Prisons Program Statement 1330.13, Administrative Remedy Procedure for Inmates, states "Inmates shall informally present their complaints to staff, and staff attempt to informally resolve any issue before an inmate files a request for Administrative Remedy."

In keeping with the spirit and intent of Bureau of Prisons Program Statement 1330.13, the following form shall be utilized by staff in attempting to informally resolve an inmate's complaint.

### ONLY ONE (1) COMPLAINT SHALL BE PLACED ON EACH FORM

INMATE'S NAME: _M. Coleman_ REG. NO.: _01723016_ UNIT: _D 1_

DATE/TIME COMPLAINT RECEIVED FROM INMATE: _5-24-06_

NATURE OF COMPLAINT: _Medical Staff/Bureau of Prisons Officials Have denied and refused to allow this prisoner Hepatitis C ~~treatments~~ Vaccinations._

ACTION TAKEN TO INFORMALLY RESOLVE COMPLAINT: _There is No Such Thing As A Hepatitis C Vaccination_

A. Rupska
Assistant Health
Services Administrator

THE APPLICABLE PROGRAM STATEMENT USED IN THIS INFORMAL RESOLUTION ATTEMPT: _____

INFORMAL RESOLUTION WAS ACCOMPLISHED: _____
                                              DATE

INMATE'S SIGNATURE: _____

SIGNATURE INDICATES INMATE'S ACCEPTANCE OF RESOLUTION

EXHIBIT
1

Attachment 1
Page 2 (front)
THA-1330.13B

## U. S. PENITENTIARY/FEDERAL PRISON CAMP

Terre Haute, Indiana

### INFORMAL RESOLUTION FORM

Bureau of Prisons Program Statement 1330.13, Administrative Remedy Procedure for Inmates, states "Inmates shall informally present their complaints to staff, and staff attempt to informally resolve any issue before an inmate files a request for Administrative Remedy."

In keeping with the spirit and intent of Bureau of Prisons Program Statement 1330.13, the following form shall be utilized by staff in attempting to informally resolve an inmate's complaint.

### ONLY ONE (1) COMPLAINT SHALL BE PLACED ON EACH FORM

INMATE'S NAME: _M. Coleman_ REG. NO.: _01723-016_ UNIT: _D-1_

DATE/TIME COMPLAINT RECEIVED FROM INMATE: _5-24-06_

NATURE OF COMPLAINT: _Medical staff Has denied and refused to draw blood from this prisoner Regarding chronic care._

ACTION TAKEN TO INFORMALLY RESOLVE COMPLAINT: _5/25/06 You need to Sign up for Sick call And Be Medically examined. If Blood Test are indicated Then The MLP or MD Can order them._

A. Rupska
Assistant Health
Services Administrator

THE APPLICABLE PROGRAM STATEMENT USED IN THIS INFORMAL RESOLUTION ATTEMPT: _____

INFORMAL RESOLUTION <u>WAS ACCOMPLISHED</u>: _____

                                    DATE

INMATE'S SIGNATURE: _____

SIGNATURE INDICATES INMATE'S ACCEPTANCE OF
RESOLUTION

**EXHIBIT**

**2**

Attachment 1
Page 2 (front)
THA-1330.13B

## U. S. PENITENTIARY/FEDERAL PRISON CAMP

Terre Haute, Indiana

### INFORMAL RESOLUTION FORM

Bureau of Prisons Program Statement 1330.13, Administrative Remedy Procedure for Inmates, states "Inmates shall informally present their complaints to staff, and staff attempt to informally resolve any issue before an inmate files a request for Administrative Remedy."

In keeping with the spirit and intent of Bureau of Prisons Program Statement 1330.13, the following form shall be utilized by staff in attempting to informally resolve an inmate's complaint.

### ONLY ONE (1) COMPLAINT SHALL BE PLACED ON EACH FORM

INMATE'S NAME: Colemon, M.  REG. NO.: 01723016  UNIT: D1

DATE/TIME COMPLAINT RECEIVED FROM INMATE: 5-30-06

NATURE OF COMPLAINT: Intentional-Preplanning Homicide Complainent Has been diagnosis with Hepatahs C which He is continuously sick but deprived of medication, See PS objectives: 5360.21 3(9) §§ 331, §375

ACTION TAKEN TO INFORMALLY RESOLVE COMPLAINT: You are ex- to the Staff Physci on 4/29/06

A. Kubeka
Assistant Health
Services Administrator

THE APPLICABLE PROGRAM STATEMENT USED IN THIS INFORMAL RESOLUTION ATTEMPT: _____

INFORMAL RESOLUTION WAS ACCOMPLISHED: _____

                                DATE

INMATE'S SIGNATURE: _____

SIGNATURE INDICATES INMATE'S ACCEPTANCE OF RESOLUTION

EXHIBIT

3

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Coleman, Monroe          01723-016      D-1      USP T. Haute
      LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A– INMATE REQUEST**

Medical staff only concerned about getting
money from a D.C. prisoner. Blood drawn
is for chronic care purposes and not for a
$2.00 purpose. Why hasn't blood been
drawn from this prisoner? When will he
be scheduled for blood drawn?

6-5-06
DATE                              SIGNATURE OF REQUESTER

**Part B– RESPONSE**

RECEIVED
USP TERRE HAUTE

See Attachment

6-15-06
DATE

WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE                    CASE NUMBER: 415201-71

                                              CASE NUMBER:

**Part C– RECEIPT**

Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____
DATE                              RECIPIENT'S SIGNATURE (STAFF MEMBER)

USP LVN

4.1

EXHIBIT
4

Remedy #: 415824-F1

# PART B - RESPONSE

This is in response to your Request for Administrative Remedy receipted June 7, 2006, in which you state the Medical department is only concerned with getting $2.00 from D.C. prisoners. You also state blood draws are for chronic care and ask why your blood has not been drawn.

An investigation of your request and a review of your medical record reveals that you arrived at USP Terre Haute on April 12, 2006. You were examined by your Primary Care Provider on April 24, 2006, who addressed your Chronic Care Clinic issues. You were placed on the list to have blood tests drawn. Once your name reaches the top of the list, the blood test will be collected. You will not be charged a $2.00 co-pay fee for blood draws.

Based on these facts, this response to your Request for Administrative Remedy is for informational purposes.

If you are dissatisfied with this response, you may appeal to the Regional Director, Federal Bureau of Prisons, Gateway Complex, Tower II, 8th Floor, 4th & State Avenue, Kansas City, Kansas 66101. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.

6-15-06
_____
Date

_____
Mark A. Bezy, Warden

4.2

U.S. Department of Justice

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: Coleman, Morece L.    01723-016    D-1    USP T. Haute
      LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A - REASON FOR APPEAL**

Remedy # 415824-F1

Regardless, the BOP medical staff is unaware that blood drawn is an essential issue to this matter which this chronic illness is worsening every day that passes shows intentional Homicide....

6-18-06
DATE

C. L_____
SIGNATURE OF REQUESTER

**Part B - RESPONSE**

JUN 26 2006

_____
DATE

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE

_____
REGIONAL DIRECTOR

CASE NUMBER: 415824-R1

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____
DATE

SIGNATURE, RECIPIENT OF REGIONAL APPEAL

USP LVN

BP-230(13)
JUNE 2002

4.3

**U.S. Department of Justice**
**Federal Bureau of Prisons**
**North Central Regional Office**

**Regional Administrative Remedy Appeal**
**Part B - Response**

**Admin Remedy Number:  415824-R1**

This is in response to your Regional Administrative Remedy Appeal dated June 18, 2006, concerning blood tests.  You question why Health Services staff have not drawn blood to assess your chronic medical condition.  For relief, your request information pertaining to the schedule of future blood tests.

We have reviewed the documentation related to your appeal.  Your BOP providers are familiar with the requisite tests for the ongoing assessment and treatment of Hepatitis C.  The referenced waiting list ensures all inmates' needs are addressed in a fair and timely manner.  Based on the sound clinical judgement of your providers, and their knowledge of the BOP's Clinical Practice Guidelines for Hepatitis and the BOP's Patient Care policy (Program Statement 6013.01), we shall defer decisions to the local level.

Based on these findings, this response is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534.  Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

_8/29/04_
**Date**

Michael K. Nalley, Regional Director

4.4

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments, must be submitted with this appeal.

| From: | COLEMAN, MONROE L. | 01723-016 | D-1 | USP TERRE HAUTE |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

Part A - REASON FOR APPEAL Plaintiff denied a right secured to him by either the Const. and/or a specific federal statute. A federal right does exist. This inmate has a federally protected right to health care which is a violation of Eighth Amend. rights when there is an intentional denial of needed medical care, or when a prison official's conduct indicates deliberate indifference to the medical needs of inmates. Priest v. Cupp, 545 P2d 917(Ore. Ct. App. 1976), the ct explained was what is required is that the inmate be afforded such medical care, in the form of diagnosis & treatment, as is reasonably available under the circumstances of his confinement A medical condition. The American Correctional Association relating to medical services for prisoners; the adequate treatment for the chronically ill. See Estes vs Collier, 501 F 2d 1291(5th Cir. 1974); Boyce v. Alizaduh, 595 F2d 948(4th Cir. 1979); Shapang vs Bindham, 305 F. Supp. 1795(N.D. Ala. 1980) BOP medical staff and administrative officials are intentionally awaiting for this inmate to get sicker before providing him with Hepatitis C medication promptly. This is an act of "deliberate indifference" when the disease can possibly to be put to sleep. What's the reason for waiting when he needs the medication now?

Sept. 11th, 2006

DATE                                          SIGNATURE OF REQUESTER

Part F - RESPONSE

RECEIVED
SEP 2? 2006
Administrative Remedy Section

DATE                                          GENERAL COUNSEL

FIRST COPY: WASHINGTON FILE COPY              CASE NUMBER: 415824-1/

Part C - RECEIPT

CASE NUMBER:

Return to: _____

| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|---|
| SUBJECT: | | | | |

DATE                                          SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

USP LVN                                       BP-231(13)
                                              JUNE 2002

4. 5

**Administrative Remedy Number 415824-A1**
**Part B - Response**

You contend you have not had blood drawn to assess your chronic medical condition.  Specifically, you request laboratory testing and medication for Hepatitis C.

Our review of this matter reveals both the Warden and Regional Director have adequately addressed your concerns.  Relevant portions of your medical record have been reviewed which reveal laboratory studies were performed on August 14, 2006.  Results of these tests indicate you have hepatitis C.  Medical staff follow the Bureau of Prisons' Clinical Practice Guidelines in the management and treatment of hepatitis C.  Based upon your genotype, you meet the criteria for interval monitoring of lab work and clinical evaluation during chronic care visits. Hepatitis treatment decisions are made on a case-by-case basis in relation to objective clinical findings.

It is evident you have received prompt, professional medical care consistent with reasonable community standards and Bureau of Prisons' policy.

This response is for informational purposes only.

_November 13, 2006_
Date

Harrell Watts, Administrator
National Inmate Appeals

4. 6

4. 6

**U.S. DEPARTMENT OF JUSTICE**
Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Coleman, Monroe L.    01723016    D-1    USP Terre

LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A– INMATE REQUEST**

This prisoner has requested medicine for Hepatitis C which BOP officials have refused and denied such treatment based on discriminatory or prejudicially reasons. This irresponsible act by BOP officials are resulting in intentional murder and neglect. ("criminal" charges) PS. 5100.07 Chapter 10 §331 & 335.

6-5-06    Coleman L.

DATE    SIGNATURE OF REQUESTER

**Part B– RESPONSE**

RECEIVED
JUN 7 2006
USP TERRE HAUTE

See Attachment

6-15-06
DATE    WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE    CASE NUMBER: 415820-F1

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____

LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

DATE    RECIPIENT'S SIGNATURE

USP LVN    PRINTED ON RECYCLED PAPER    BP-229(13)
APRIL 1982

EXHIBIT
5

5.1

Remedy #: 415820-F1

# PART B - RESPONSE

This is in response to your Request for Administrative Remedy receipted June 7, 2006, in which you state you are being denied treatment for Hepatitis C based on discrimination. You also claim that BOP Officials are acting irresponsibly and this is resulting in intentional murder and neglect.

An investigation of your request and a review of your medical record reveals that you arrived at USP Terre Haute on April 12, 2006. You were medically examined by your Primary Care Provider on April 24, 2006, who addressed your Chronic Care Clinic issues. You were placed on the list to have blood tests drawn. These blood tests will diagnosis which Hepatitis C Genotype you have. Once these tests have been completed and the results received, a treatment plan can be discussed with your Primary Care Provider.

On May 3, 2006, you signed up for sick call and requested the Hepatitis A and Hepatitis B vaccinations. On May 8, 2006, you were examined by the Physician Assistant who prescribed these two vaccinations. You have been placed on the list for the vaccines. You will be placed on the call-out when your name reaches the top of the list. At that time you will receive the Hepatitis A and Hepatitis B vaccinations.

In summary, you have been treated appropriately for your medical condition. There is no evidence that any treatment has been denied regarding your care. There also is no evidence that any BOP Officials have acted in a discriminating, prejudiced , or irresponsible way, regarding your health care, that would result in intentional murder or neglect.

Based on these facts, this response to your Request for Administrative Remedy is denied.

If you are dissatisfied with this response, you may appeal to the Regional Director, Federal Bureau of Prisons, Gateway Complex, Tower II, 8th Floor, 4th & State Avenue, Kansas City, Kansas 66101. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.

6-15-06
_____
Date

_____
Mark A. Bezy, Warden

5.2

U.S. Department of Justice

Federal Bureau of Prisons

**Regional Administrat** **Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: Coleman, Monroe    01723-016    D-1    USP T, Haute

LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A - REASON FOR APPEAL**

Remedy # 415820-F1

the BOP medical staff needs to be charged with intentional homicide because it seems that the waiting period is for whether this prisoner's health will drop before paying the high medical cost. this chronic illness awareness to BOP officials, is not new... why continue to PROCRASTINATE?

6-18-06

DATE                                    SIGNATURE OF REQUESTER

**Part B - RESPONSE**

JUN 26 2006

DATE                                    REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                    CASE NUMBER: 415820-R1

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____

LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

DATE                                    SIGNATURE, RECIPIENT OF REGIONAL APPEAL

USP LVN                    PRINTED ON RECYCLED PAPER                    BP-230(13)
JUNE 2002

5.3

**U.S. Department of Justice**
**Federal Bureau of Prisons**
**North Central Regional Office**

**Regional Administrative Remedy Appeal**
**Part B - Response**

Admin Remedy Number: 415820-R1

This is in response to your Regional Administrative Remedy Appeal dated June 18, 2006, disputing the Warden's response. You opine Health Services staff should be charged with intentional homicide, as they are delaying medical care to avoid paying high medical costs. Your appeal makes no specific request for relief.

We have reviewed the documentation related to your appeal. Based on this review, we concur with the Warden's response. Since your admission on April 12, 2006, essential medical care has been readily available. Throughout the BOP, specific diagnostic and treatment interventions for Hepatitis C may only occur in accordance with the BOP's Clinical Practice Guidelines for Hepatitis and the BOP's Program Statement 6031.01, Patient Care. Contrary to your perception, medical decisions are based on the inmate's clinical presentation, rather than the budget.

Based on these findings, this response is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534. Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

_8/28/06_
Date

_Michael K. Nalley, Regional Director_

5.4

**U.S. Department of Justice**

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: Coleman, Big, Moses       0172 3186       D-1       USP Terre Hte

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A - REASON FOR APPEAL**   ***; protection of the inmate's life and health
from administrative action. See Hoitt v. Vitek, 497 F2d 598
(1st Cir. 1984); Runnels v Rosendale, 499 F2d 733 (9th Cir 1974); Jefferson
V Harris, 479 F. Supp 333 (S.D.N.Y. 1979); right to free from the
infliction of cruel and unusual punishments as guaranteed by the
8th Amendment. Prisoner is lazy, feeling sick, thinks his life is worthless
sometimes, frustrated, lost appetite, suicide & UMBling sometimes.
Medical denial care amount to cruel & Unusual Punishment Estelle
V Gamble, 429 U.S. 97 (1976); Banks v Teasdale, 492 FSupp 650; Prison officials 546 F2d 1077; Kelsey v Ewing 652 F2d 4; Deliberate
Indifferent to Medical Care and Need. Don't wait until I am too sick!!!

9-27-06
DATE

SIGNATURE OF REQUESTER

**Part B - RESPONSE**

R G E
OCT 10
Administrative Rem...

DATE

FIRST COPY: WASHINGTON FILE COPY

**Part C - RECEIPT**

GENERAL COUNSEL

CASE NUMBER: 415820-A2

CASE NUMBER: _____

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL       REG. NO.       UNIT       INSTITUTION

SUBJECT: _____

DATE

SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

USP LVN

5.5

BP-231(13)
JUNE 2002

**Administrative Remedy Number 415820-A2**
**Part B - Response**

You request treatment for hepatitis C.

Our review of this matter reveals both the Warden and Regional
Director have adequately addressed your concerns. Relevant
portions of your medical record have been reviewed which reveal
you have a history of hepatitis C. Your hepatitis C is a
genotype 1, which does not respond as well to treatment. In
addition, you have a history of bipolar disorder, which increases
your risk of negative side effects from the requested medication.
All these factors are carefully weighed before considering the
nature and extent of treatment for hepatitis C. Your diagnostic
studies and clinical status do not meet the criteria for
initiation of treatment at this time. However, you will be
monitored in Chronic Care Clinic to assess the status of your
disease on a regular basis, and treatment will be initiated when
and if considered to be medically-indicated.

It is evident you have received prompt, professional medical care
consistent with reasonable community standards and Bureau of
Prisons' policy.

This response is for informational purposes only.

December 27, 2006
Date

Harrell Watts, Administrator
National Inmate Appeals

5.6

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

### REQUEST FOR ADMINISTRATIVE REMEDY

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Coleman, Monroe L.    01723-016    D-1    USP T, Haute
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A– INMATE REQUEST**

The BOP Medical Staff is only concearned with
taking money (regardless of how the money
was placed in the prisoner's account) from
this prisoner which money was taken dur-
ing the month of April or May because
he requested the Hepatitis B vaccination
which is required because he has Hepatitis C.
Without the vaccination he may or will die quicker.

6-15-06    Discrimnatory
DATE         Acts                              _____
                                               SIGNATURE OF REQUESTER

**Part B– RESPONSE**



See Attachment

_____          _____
        DATE                         WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE                    CASE NUMBER: 410819-71

                                              CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____                    _____
      DATE                          RECIPIENT'S SIGNATURE (STAFF MEMBER)        BP-229(13)
                                                                                APRIL 1982

**EXHIBIT**

**6**

6-1

01/09/2007  15:21  8122383303                    FEDERAL PRISON LEGAL                                    PAGE  06/07

Remedy #: 417019-F1

# PART B - RESPONSE

This is in response to your Request for Administrative Remedy receipted June 16, 2006, in which you state the Medical department is only concerned with getting $2.00 from D.C. prisoners. You complain that you were charged for requesting a Hepatitis B vaccination.

An investigation of your complaint reveals the Inmate Copayment Program Statement 6031.02 issued on August 15, 2005, clearly defines what services are charged and what services are provided without charge. District of Columbia inmates are not exempt from copayment charges. On May 8, 2006, you were seen on sick call requesting Hepatitis A & B vaccines because you have Hepatitis C. This appointment was requested by you. By policy this is considered a charged visit. The need for Hepatitis A & B vaccines will be ordered by your assigned physician and you be put on call out to receive the vaccines she considers appropriate for you.

Based on these facts, this response to your Request for Administrative Remedy is for informational purposes.

If you are dissatisfied with this response, you may appeal to the Regional Director, Federal Bureau of Prisons, Gateway Complex, Tower II, 8th Floor, 4th & State Avenue, Kansas City, Kansas 66101. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.

7-7-06
_____
Date

_____
Mark A. Bezy, Warden

6.2

U.S. Department of Justice

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: Coleman, Monroe L.    01723-016    D-1    USP Terre Haute
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A - REASON FOR APPEAL**    For this writer requesting a necessity for a Hepatitis B or A vaccination is a must to safeguard his health and this required vaccination is believed to be on the list for chronic care for Hepatitis C victims/patient. It is requested that the $2.00 be returned to inmate's account.    Remedy # 417019-F1

7-23-06
DATE    SIGNATURE OF REQUESTER

**Part B - RESPONSE**

_____    _____
DATE    REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

FIRST COPY: REGIONAL FILE COPY    CASE NUMBER: 417019-R1

**Part C - RECEIPT**    CASE NUMBER: _____

Return to: _____    _____    _____    _____
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____    _____
DATE    SIGNATURE, RECIPIENT OF REGIONAL APPEAL

BP-290(13)
JUNE 2002

USP LVN

6.3

**U.S. Department of Justice**
**Federal Bureau of Prisons**
**North Central Regional Office**

**Regional Administrative Remedy Appeal**
**Part B - Response**

**Admin Remedy Number:** 417019-R1

This is in response to your Regional Administrative Remedy Appeal dated July 23, 2006, disputing the Warden's response. You opine your Hepatitis C condition warrants Hepatitis A and B vaccinations at no expense to you. For relief, you request a refund for your previously incurred $2.00 copayment fee.

We have reviewed the documentation related to your appeal. Per the Inmate Copayment Program, Program Statement 6031.02, self-initiated medical encounters result in a $2.00 copayment fee. Please review this policy to avoid further misunderstanding. As needed, concerns or questions may be addressed to your Health Services Administrator.

Based on these findings, your Regional Administrative Remedy Appeal is denied.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534. Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

9/28/06
Date

Michael K. Nalley, Regional Director

6-4

**U.S. DEPARTMENT OF JUSTICE**                                    **REQUEST FOR ADMINISTRATIVE REMEDY**

Federal Bureau of Prisons

| | | | | |
|---|---|---|---|---|
| | | 404723-016 | | USP TERRE HAUTE |
| LAST NAME, FIRST, MIDDLE INITIAL | | REG. NO. | UNIT | INSTITUTION |

**Part A- INMATE REQUEST**                    **"SENSITIVE COMPLAINT"**

Previously this prisoner has filed an Administrative Complaint (Nos. 415824-A1 & 415820-A2) which are pending before the BOP Central Office in Washington, D.C. However, this complaint concerns an emergency biopsy for diagnosis of Hepatitis C. A civil action (Case 06-cv1835(JDB)) is pending in Washington, D.C. In accord with 18 U.S.C. §§4001,4042 the statutes mandate medical exam to be provided by Bureau of Prisons and/or for this District of Columbia inmate. Any failure to comply with this request within 3 working days will result in the filing of a Civil Suit for "malicious" ($1.5 million dollars) committed by BOP persons officials and medical staff. See 28 C.F.R. §549 (Medical Services Subpart A-Infectious Diseases)

December 4th, 2006

_____                    _____
DATE                                     SIGNATURE OF REQUESTER

                                         See Attachment

_____
DATE                                     WARDEN OR REGIONAL DIRECTOR

Part B- RESPONSE

FIRST COPY: WARDEN'S ADMINISTRATIVE REMEDY FILE           CASE NUMBER: 422919-F1

Part C- RECEIPT                                            CASE NUMBER:

Return to:
_____
LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____
DATE                                      RECIPIENT

**EXHIBIT**
7

7-1

Remedy #: 435919-F1

# PART B - RESPONSE

This is in response to your Request for Administrative Remedy receipted December 7, 2006, wherein you allege medical negligence in regards to you not receiving an emergency liver biopsy for the diagnosis of chronic Hepatitis C.

An investigation of your medical record and a review of your request reveals that you have been diagnosed with chronic hepatitis C with genotype 1. Your liver enzymes were within normal limits. The Bureau of Prisons Clinical Practice Guidelines addresses and provides a guideline for the treatment of chronic hepatitis C.

Accordingly, you are receiving proper medical treatment for the aforementioned conditions.

If your condition changes or you have questions regarding your care, please sign up through sick call to be re-evaluated by the physician assistant.

Based on these facts, your response is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Regional Director, Federal Bureau of Prisons, Gateway Complex, Tower II, 8th Floor, 4th & State Avenue, Kansas City, Kansas 66101. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.

_1-16-07_
Date

R.V. Veach, Warden

F. 2

# Guidelines for the Prevention and Treatment of Viral Hepatitis

## October 2005

(Federal Bureau of Prisons - Clinical Practice Guidelines)

Clinical guidelines are being made available to the public for informational purposes only. The Federal Bureau of Prisons (BOP) does not warrant these guidelines for any other purpose, and assumes no responsibility for any injury or damage resulting from the reliance thereof. Proper medical practice necessitates that all cases are evaluated on an individual basis and treatment decisions are patient-specific.

EXHIBIT
BOP
Guidelines

## Treatment

Inmates diagnosed with acute hepatitis C should be considered for antiviral therapy in consultation with a physician with expertise in managing hepatitis. Reported data suggest that antiviral therapy is beneficial in treating persons with acute HCV infection; however, the timing and the optimal treatment regimen in this setting are uncertain. Therefore, treatment decisions should be made on a case-by-case basis. In one study, 52% of symptomatic individuals with acute hepatitis C spontaneously cleared the virus within 12 weeks. Of those who did not clear the virus, treatment initiated within 3-6 months of infection resulted in a sustained virological response in 81%. Thus, the American Association for the Study of Liver Disease (AASLD) guidelines state: "In the absence of controlled study data, no definitive recommendations can be made about the timing of treatment initiation; however, it seems reasonable to delay treatment for 2-4 months after acute onset to allow for spontaneous resolution." Subsequent treatment, if indicated, should consist of pegylated interferon, with or without ribavirin. Optimal treatment duration is unknown; if tolerated, treatment should be given for at least 12 weeks, and then an HCV RNA test obtained to determine treatment response.

## Chronic Hepatitis C Infection

### Screening

Newly incarcerated inmates should be provided educational information on the transmission, natural history, and medical management of HCV infection by appropriately trained personnel in accordance with BOP policy. The BOP peer-oriented video on infectious diseases, "Staying Alive", and the information in *Appendix 2 (Inmate Fact Sheet: Hepatitis B and C Viral Infection)* and other appropriate patient educational tools should be used to facilitate counseling efforts.

**Screening method:** The preferred screening test for HCV infection is an immunoassay (e.g., EIA or CIA) that measures antibodies to HCV antigens.

**Clinical indications:** Inmates should be screened for hepatitis C regardless of sentencing status if any of the following clinical indications exist:

- Inmates on chronic hemodialysis (screen ALT levels monthly and anti-HCV by immunoassay semiannually);

- Inmates with elevated ALT levels of unknown etiology;

- As clinically indicated, e.g., inmates with signs or symptoms of acute or chronic hepatitis or percutaneous blood exposure while incarcerated; and

- Evidence of extrahepatic manifestations of HCV infection such as mixed cryoglobulinemia, membranoproliferative glomerulonephritis, or porphyria cutanea tarda.

**Non-sentenced inmates:** Screening by immunoassay for HCV infection in asymptomatic, highly mobile, non-sentenced inmates should ordinarily not be pursued unless clinically indicated. Asymptomatic non-sentenced inmates in BOP detention facilities with histories of injection drug use or other high risk behaviors for HCV infection, should be counseled regarding their risk for HCV infection and behaviors that will reduce transmission of HCV infection to others during incarceration and upon release. Referrals to community HCV testing sites should be made when appropriate. Long-term inmates in BOP detention facilities should be screened for HCV infection in accordance with guidelines for sentenced inmates.

**Sentenced inmates:** An anti-HCV screening immunoassay should be considered for the following sentenced inmates during the prevention baseline visit:

- Inmates who have ever injected illegal drugs or shared equipment;

- Inmates who have received tattoos or body piercings while in jail or prison;

- Inmates with HIV infection or chronic HBV infection;

- Inmates who received a blood transfusion/organ transplant before 1992 or received clotting factor transfusion prior to 1987; and

- Inmates with a history of percutaneous exposure to blood.

Sentenced inmates who have risk factors for HCV infection, but initially refuse testing, should be counseled periodically during preventive health visits on the need for testing during routine patient encounters.

## Diagnosis and Counseling

**Diagnosis:** The detection of anti-HCV by immunoassay in a person with risk factors for acquiring HCV infection strongly predicts prior infection with HCV. A **quantitative** HCV nucleic acid test, however, is required **before initiating antiviral therapy**, regardless of HCV genotype, to both confirm chronic infection and guide therapy. If the quantitative HCV nucleic acid test is negative, the more sensitive qualitative HCV nucleic acid test (lower limit of detection of 50 IU/mL) should be obtained. Other important issues regarding HCV diagnostic assays include:

- The appropriate processing of HCV nucleic acid test samples is essential, since viral RNA is unstable and false negative tests may result from inadequate processing.

- The RIBA* supplemental test is not routinely recommended for diagnosing chronic HCV infection.

**Patient counseling:** Inmates diagnosed with chronic HCV infection should be counseled by a health care provider about the natural history of the infection, potential treatment options, and specific measures for preventing transmission of HCV infection to others (during incarceration and upon release), including the following information and recommendations:

- Most persons with chronic HCV infection will remain healthy, but a small number of persons will develop serious liver disease. Talk to your health care provider about your personal health status and risk of liver disease.

- Current drug treatment options for chronic hepatitis C are moderately effective. Newer medications should be available in the future that will improve treatment options. Medications may or may not be appropriate for you at this time. Talk to your doctor about your specific treatment plan.

- Do not inject drugs, have sex with other inmates, or get a tattoo or body piercing while in prison. Individuals who continue to inject drugs should be counseled to avoid reusing or sharing syringes, needles, water, and cotton or other paraphernalia.

- Do not share personal items that might have your blood on them, such as toothbrushes, dental appliances, nail-grooming equipment or razors.

- Cover cuts and skin sores to keep blood from contacting other persons.

- Before release, talk to a health care provider about specific ways you can reduce the risk of transmitting HCV infection to others after you are released.

- For the remainder of your life, do not drink alcohol at all, or only rarely, and speak to a physician prior to taking any new medications, including over-the-counter medications such as nonsteroidal anti-inflammatory drugs (NSAIDs) and herbal remedies, that may damage your liver.

- Upon release, do not donate blood, body organs, other tissue or semen.

- Upon release, seek medical attention so that you receive appropriate monitoring and treatment of your condition.

## Natural History

An estimated 50-85% of persons infected with HCV develop chronic infection, while 15-50% of newly infected persons are able to clear the virus spontaneously. Chronic HCV infection frequently results in high levels of HCV RNA in the blood, ranging from $10^5$-$10^7$ international units (IU)/mL, despite the presence of HCV antibodies. The majority of persons with chronic HCV infection are asymptomatic.

Chronic HCV infection has an unpredictable course that is frequently characterized by fluctuations in ALT levels that may or may not be associated with significant liver disease. Approximately one-third of persons with chronic HCV infection have no laboratory or biopsy evidence of liver disease.

An estimated 10-15% of persons with chronic HCV infection develop progressive fibrosis of the liver leading to cirrhosis. High levels of alcohol consumption, older age at the time of infection, HIV infection, chronic HBV infection, and male gender increase the risk of disease progression. The degree of viremia ("viral load") and the HCV genotype, however, do not affect the progression of liver disease. The degree of ALT elevation does not strongly correlate with the risk of disease progression, but persons who develop cirrhosis are more likely to have marked elevations in serum ALT levels. Once cirrhosis develops in persons with chronic HCV infection, the risk of hepatocellular carcinoma (HCC) is about 1-4% per year.

## Evaluation and Treatment

**Baseline evaluation:** A baseline clinician evaluation should be conducted for all inmates diagnosed with HCV infection and include at least the following:

- Estimation and documentation of the earliest possible date of infection (whenever feasible);

- Targeted history and physical examination to evaluate for signs and symptoms of liver disease, quantify prior alcohol consumption and determine risk behaviors for acquiring HCV infection;

- Serum ALT, AST, bilirubin, alkaline phosphatase, albumin, prothrombin time, and further diagnostic evaluations as clinically warranted, for other potential causes of liver disease such as hemochromatosis, Wilson's disease, and autoimmune hepatitis;

- CBC with differential and platelet count;

- Renal function assessment (serum creatinine / BUN); and

- Anti-HIV by immunoassay and HBsAg.

**Preventive measures:** The following preventive interventions are indicated for inmates diagnosed with chronic HCV infection:

- **Hepatitis B vaccination:** Serologic prescreening for immunity to HBV infection should be considered for inmates who self-report previous, but undocumented hepatitis B vaccination by measuring anti-HBs. It is cost-effective to screen inmates from countries where HBV infection is endemic, e.g., Asia, the South Pacific, sub-Saharan Africa, and certain populations in the Arctic, South America, and the Middle East, by measuring total anti-HBc. Vaccination of inmates not in one of the above two categories should be offered

without prescreening for prior infection.  Inmates with evidence of liver disease should be priority candidates for vaccination.

- **Hepatitis A vaccination:**  Serologic prescreening for immunity to HAV infection by testing for IgG (or total) anti-HAV should be considered for Native American inmates and foreign-born inmates from Latin America, Africa, Southeast Asia, and China where hepatitis A is endemic, and among inmates 50 years of age or older.  All other inmates should be offered vaccination without prescreening for prior infection.  Inmates with evidence of liver disease should be priority candidates for vaccination.  The combination hepatitis A/B vaccine (Twinrix®) is a convenient and cost-effective option for inmates requiring vaccination against both viruses.

- **Pneumococcal vaccine and yearly influenza vaccination** should be offered for inmates who have developed cirrhosis.

- **Hepatocellular carcinoma (HCC) screening:**  Inmates with chronic HCV infection are at increased risk for HCC, but **the optimal screening strategy is uncertain.**  Periodic screening for HCC, with a liver ultrasound or abdominal CT-scan (e.g., annually) and serum alpha-fetoprotein (e.g., every 6 months), should be considered for inmates with HCV infection and cirrhosis.

- **Screening for esophageal varices** should be considered in any inmate with known cirrhosis, and in those with suspected cirrhosis who may not be candidates for liver biopsy (e.g., serum markers for impaired hepatic synthetic function, severe thrombocytopenia).

**Detention center/short-term inmates:**  Inmate candidates for hepatitis C treatment entering BOP short-term detention facilities, including pre-trial and nonsentenced federal detainees, should ordinarily **not** be started on antiviral therapy.  The potential for interrupted antiviral therapy for hepatitis C places the inmates at risk for a number of undesirable outcomes, including treatment failure if the course of treatment is not completed, and adverse effects from medications if the inmate does not receive the required laboratory and clinical monitoring upon release or transfer.

Inmates entering BOP custody who are already on treatment for hepatitis C, should be maintained on antiviral therapy, unless treatment must be discontinued for medical reasons.  Consult with a Central Office physician if there are questions regarding continuation of therapy.

**Treatment considerations:**  Treating physicians should weigh the following factors in assessing the appropriateness of treatment and the best timing for initiating treatment as they counsel inmates with chronic HCV infection:

- Only 10-15% of persons with HCV infection develop significant long term complications of liver disease, usually 20-30 years after initial infection.

- No laboratory parameters definitively predict which persons infected with HCV will develop cirrhosis or will respond to medical therapy.

- The presence of moderate to severe fibrosis (Metavir ≥ stage 2 or Ishak ≥ stage 3) on liver biopsy is currently the best marker for determining who should be offered antiviral therapy for hepatitis C.

- The combination of a pegylated interferon plus ribavirin is significantly more effective in clearing viremia and establishing sustained viral response rates (SVR) than prior treatment regimens.

- Although current antiviral therapy is usually well tolerated, serious drug side effects may occur.

- Future treatments for hepatitis C may be more effective and more easily tolerated.

An evidenced-based strategy for evaluating inmates for hepatitis C treatment is outlined in *Appendix 8 (Step-Wise Approach for Evaluating and Treating Chronic Hepatitis C)*.

**Treatment contraindications and considerations**: Inmates with chronic HCV infection who are potential candidates for antiviral therapy should first be assessed for absolute or relative treatment contraindications as listed in *Appendix 9 (Contraindications to Interferon or Ribavirin Therapy)*. Inmates with contraindications to antiviral therapy should not be treated with interferon and ribavirin as long as the contraindication exists.

The following co-morbidities, although not absolute contraindications, should be carefully evaluated prior to initiating antiviral therapy:

- **Mental illness:** Inmates with a history of psychiatric illness or with signs or symptoms of mental illness should be referred to a psychologist or psychiatrist for assessment. Inmates with serious mental illness should be treated and stabilized prior to pursuing a further work-up for treatment.

- **Alcohol:** HCV-infected inmates being considered for treatment who have significant alcohol abuse histories should receive specific counseling messages. Heavy and prolonged alcohol use is an independent risk factor for the development of cirrhosis, and alcohol accelerates the progression of HCV-related fibrosis. Therefore HCV treatment without abstinence from alcohol is unlikely to be of benefit. The treatment response to peginterferon plus ribavirin is significantly reduced in individuals who drink more than 30 grams of alcohol per day, and perhaps with lower levels of consumption, as well.

  An inmate's unwillingness to abstain from alcohol intake while incarcerated is a potential indicator of alcoholism and should be evaluated. Effective treatment for alcoholism should be offered to as many HCV-infected inmates as possible prior to release, whether or not they have been administered HCV treatment or responded to such treatment.

- **Substance abuse:** Inmates with significant substance abuse other than alcohol may have a number of issues which can indirectly affect whether HCV treatment will be successful. Injection drug users may also be at risk for HIV, HBV, endocarditis, and possible re-infection with HCV. Amphetamine and cocaine abuse may result in cardiovascular complications which carry morbidities in and of themselves, in addition to the additive risks of interferon and ribavirin. Ongoing substance use in the controlled environment of a prison or jail is, at best, an indicator that the inmate is not taking adequate responsibility for his or her overall health. Treatment decisions must be individualized where these issues are present.

**Confirmation of infection:** Inmate candidates for liver biopsy and/or antiviral therapy should have chronic HCV infection confirmed (if not done previously) through the detection of HCV RNA by a **quantitative** nucleic acid test. A single negative test should be repeated with the more sensitive **qualitative** nucleic acid test to confirm infection.

**Genotype determination:** The HCV genotype markedly affects treatment response. Persons with genotypes 2 or 3 have a 76-82% response rate to pegylated interferon/ribavirin therapy, compared to persons with genotype 1 who have a 40-45% response rate. The HCV genotype must be determined prior to pursuing treatment, since the genotype will affect patient counseling, the evaluation strategy, the decision to treat for a subset of patients, and the recommended drug regimen. Once the HCV genotype has been determined in a specific patient, serial genotype testing is not indicated unless re-infection is suspected, since HCV genotypes do not change during the course of an infection.

**Identifying candidates for liver biopsy:** Liver biopsy is the best means of staging liver disease in patients with chronic hepatitis C and may identify other etiologies of chronic liver disease, such as autoimmune hepatitis, alcoholic liver disease, Wilson's disease, and hemochromatosis. Determining the degree of liver disease is particularly important for those inmates who may wish to defer treatment if they have normal liver histology or minimal fibrosis, as well as in cases where relative contraindications to treatment exist, i.e., psychiatric and substance abuse disorders not in full remission, and medical conditions such as diabetes or cardiovascular disease which are not fully controlled. The following guidance should be considered when determining the need for liver biopsy:

- **ALT levels:** The decision to obtain a liver biopsy should not be strongly based on ALT levels; however, ALT levels are a relevant factor that warrant monitoring and review. The greater the ALT level, the more likely it is that a person has significant liver disease; therefore, inmates with markedly elevated ALT levels should be prioritized for liver biopsy. However, even persons with normal ALT levels may have liver disease and should be evaluated for liver biopsy since a small, but significant percentage (14-24%) of persons with normal ALT levels have more than portal fibrosis (Metavir $\geq$ stage 2).

  Inmates with persistently normal ALT levels (at least 6 normal values evenly distributed over a 24-month period), and who have no other physical or laboratory evidence of chronic liver disease, were infected before the age of 35, and have no history of significant alcohol

use, are at extremely low risk of severe liver disease. Most of these persons, when biopsied, have normal liver histology or minimal fibrosis and are deemed "slow progressors." Slow progressors advance only one Metavir stage in 15-20 years or more. Women who are slow progressors are especially unlikely to develop severe liver disease during their lifetime.

Deferring liver biopsy is reasonable for inmates with persistently normal ALT levels when the risk of liver disease is extremely low. Chronic HCV infection should still be confirmed in such cases with a quantitative HCV RNA test, and if negative, should be repeated with a qualitative nucleic acid test to diagnose resolved HCV infection. Inmates with confirmed HCV infection and normal ALT levels should be monitored with a targeted history and physical examination every 6-12 months, along with a platelet count, AST, ALT, alkaline phosphatase and prothrombin time measurements.

A decreased platelet count, an increase in the AST/ALT ratio, and a prolonged prothrombin time are the earliest indicators of cirrhosis and portal hypertension and warrant an aggressive evaluation for liver disease.

- **Genotypes 2 and 3**: Liver biopsy can be deferred and antiviral therapy empirically initiated for certain inmates with genotypes 2 and 3 due to the high response rates to treatment for these patients. All inmates with HCV genotypes 2 or 3, however, should be advised of the potential toxicity of interferon and ribavirin and offered liver biopsy to help determine the urgency of therapy. Other inmates, with relative contraindications to antiviral therapy, or in whom other causes of liver disease are suspected, or who have evidence of severe liver disease on physical examination or laboratory testing, should have a liver biopsy to help guide treatment decision-making.

- **Genotypes 1, 4, 5, and 6**: Liver biopsy is generally indicated for all inmates with these genotypes, since treatment is less effective in these patients. Treatment without liver biopsy may be considered for inmates with suspected compensated cirrhosis, or with certain extrahepatic manifestations of HCV infection.

- **HIV co-infection**: Inmates with hepatitis C and HIV co-infection should receive a liver biopsy regardless of ALT levels or genotype, due to the increased risk of accelerated fibrosis and the greater potential for adverse reactions with antiviral therapy.

- **Compensated cirrhosis**: Inmates with compensated cirrhosis, that is suspected from clinical and laboratory parameters, should be either referred directly for liver biopsy or treated empirically with antiviral therapy (without biopsy confirmation) in consultation with a specialist.

- **Rebiopsies**: Inmates with normal liver histology or minimal fibrosis should be rebiopsied every 2-5 years. The timing of follow-up should be made on a case-by-case basis. Inmates with minimal fibrosis, but with marked hepatocellular necrosis and inflammation should be

rebiopsied in one year or referred for treatment on a case-by-case basis, since these inmates are at greater risk of developing progressive fibrosis.

**Indications for antiviral therapy:** Inmates with the following criteria are priority candidates for antiviral therapy based on evidenced-based data and the American Association for the Study of Liver Diseases (AASLD) recommendations:

- abnormal serum ALT values;

- liver biopsy with chronic hepatitis with significant fibrosis (more than portal fibrosis: Metavir $\geq$ stage 2 or Ishak $\geq$ stage 3);

- compensated liver disease (total bilirubin < 1.5 g/dL; INR < 1.5; albumin > 3.4 g/dL; platelet count > 75,000/mm$^3$; and no evidence of hepatic encephalopathy or ascites;

- acceptable pre-treatment labs: hemoglobin > 13 g/dL in men or > 12 g/dL in women; absolute neutrophil count > 1500/mm$^3$; creatinine < 1.5 mg/dL; and

- inmate is willing to be treated and conform to treatment requirements, including abstinence from alcohol and illicit drugs.

Hepatitis C treatment should be deferred in inmates with early hepatic fibrosis who have relative contraindications to antiviral therapy, until these complicating conditions are resolved. Conversely, antiviral therapy should be considered in inmates with stage 3 or 4 fibrosis despite the presence of relative contraindications. If treatment is pursued for such individuals, the inmate must be counseled on the increased risk of side effects, and/or the potential for exacerbations in medical or psychiatric illnesses.

**Pretreatment evaluation:** Inmates should be evaluated by a physician and screened for other medical conditions that may complicate antiviral therapy.

- **Screening tests:** The following tests should be obtained (unless completed recently):

  - **Serum chemistries:** Obtain liver enzymes, bilirubin, CBC with differential and platelet count, prothrombin time, TSH, renal function, anti-HIV, HBsAg, ferritin, ANA, fundoscopy for inmates with diabetes or hypertension, and other patient-specific diagnostic tests as medically indicated.
  - **Pregnancy test** for all female inmates: Ribavirin may cause fetal abnormalities. All female inmates of childbearing potential must have a pregnancy test immediately prior to initiating therapy.
  - **Cardiac risk assessment:** Inmates should have a basic cardiac risk assessment from a clinician, since hemolysis from ribavirin may precipitate angina pectoris. An electrocardiogram should be obtained in inmates with preexisting cardiac disease. Symptomatic inmates should be carefully evaluated for cardiac disease prior to initiating treatment.

- **Mental health evaluation:** A mental health evaluation should be performed by a psychiatrist or a psychologist before prescribing interferon and ribavirin therapy to determine if mental health treatment is warranted prior to antiviral therapy or if ongoing mental health assessments are needed during treatment.

  ‣ The evaluation should include an assessment of axis I and axis II diagnoses, including a comprehensive alcohol and substance abuse history, and a suicide risk assessment. Interferon therapy has been associated with changes in mood and affect in most individuals. In a small percentage, significant depression, suicide attempts and completed suicides have resulted. The absence of a history of depression or suicide attempts does not appear to lessen the risk of these side effects from interferon; however, their presence should prompt heightened vigilance on the part of the treating providers.

  ‣ Other mental illnesses or conditions, if not treated or not in remission, may adversely affect the inmate's ability to successfully complete a course of antiviral treatment, either due to issues of compliance or inability to tolerate even mild side effects.

- **Inmates with compensated cirrhosis:** Inmates with suspected or biopsy-confirmed compensated cirrhosis should have an upper endoscopy screening for esophageal varices, a liver ultrasound or abdominal CT-scan, and measurements of alpha-fetoprotein and ammonia prior to treatment initiation. If HCC or decompensated cirrhosis is diagnosed, antiviral therapy is contraindicated.

**Treatment options:** Pegylated interferon (alfa 2a or alfa 2b) plus ribavirin is the preferred drug regimen for treating chronic hepatitis C in the absence of contraindications to either drug. Pegylated interferon is available in two formulations: PEG-Intron® (alfa 2b) and Pegasys® (alfa 2a). Ribavirin is available as: Rebetol®, Copegus®, and generic preparations that are considered bioequivalent. Clinical studies have paired pegylated interferon alfa 2a with Copegus®; and pegylated interferon alfa 2b with Rebetol®. **Ribavirin is completely ineffective as monotherapy and should never be prescribed without interferon.**

Either a 12 or 24-week course of pegylated interferon and ribavirin is effective for patients with genotypes 2 or 3 depending on treatment response; whereas a 48-week course of treatment is recommended for patients with genotype 1. Patients with genotype 1 require higher doses of ribavirin. The optimal duration of antiviral therapy is unknown for persons with genotypes 4, 5, 6, or nontypable HCV; therefore, these patients should be treated with the 48-week course of treatment recommended for genotype 1 patients. Inmates who have contraindications to ribavirin, regardless of genotype, should be treated with a 48-week course of pegylated interferon alone.

Detailed drug dosages, monitoring parameters, and potential side effects are outlined in *Appendices 10a-10d (Antiviral Medications for Chronic Hepatitis C)*.

**Interferon/ribavirin side effects and adverse reactions**: Inmates treated for chronic hepatitis C should be counseled by a clinician before and during treatment regarding both the anticipated and potential side effects/adverse reactions of interferon and ribavirin.

- **Interferon:** An influenza-like reaction often occurs within 6-8 hours of initial treatment with interferon. The fatigue, headache, fever, and myalgias often abate with subsequent treatments and can be partially aborted by premedication with antipyretics. Acetaminophen can be given safely up to 2 gm/day in divided doses. Nonsteroidal anti-inflammatory agents (NSAIDs) should not be prescribed.

  Chronic side effects of interferon can include severe fatigue, weight loss, reversible alopecia, irritability, rage, confusion, and neuropsychiatric disorders. Severe and incapacitating depression can occur, even in persons without previous histories of depression. Bone marrow suppression resulting in neutropenia and thrombocytopenia are potentially serious effects of interferon that should be anticipated and monitored closely, particularly in patients with cirrhosis or HIV infection. Thyroid dysfunction occurs in approximately 4% of persons treated with interferon and may result in irreversible thyroid dysfunction, even with cessation of drug therapy. Resultant hypothyroidism can be treated on a case-by-case basis with hormone replacement therapy, while continuing interferon; whereas, hyperthryoidism usually necessitates discontinuation of interferon.

  Pegylated interferons generally have similar side effect profiles compared to standard interferons; however, pegylated interferons induce neutropenia to a greater degree. Inmates with side effects to interferon should have their dosage reduced or therapy discontinued depending on the severity of the side effects. Serious sequelae may occur in less than 1% of persons receiving interferon treatment and can include: renal failure, pneumonitis, severe bone marrow suppression, visual and hearing loss, retinal hemorrhage, acute psychosis, and suicide.

- **Ribavirin:** Ribavirin causes a dose-related red cell hemolysis to variable degrees in nearly all persons who are treated. A decrease in the hemoglobin of 2-3 gm/dL and a decrease in hematocrit of 5-10% should be anticipated. Persons with a preexisting hemolysis or severe anemia (hemoglobin < 11 g or hematocrit < 33%) or underlying cardiovascular or cerebrovascular disease should not receive ribavirin. Persons with HIV infection or other co-morbid conditions should be monitored closely. Anemia ordinarily develops between 1 and 4 weeks of initiating therapy. New onset of episodic chest pain during therapy should be presumed to be angina pectoris until proven otherwise. Symptoms of sudden hemolysis such as dyspnea, fatigue, headache, and palpitations may develop. If anemia occurs ribavirin should be reduced in dosage or discontinued.

  Clearance of ribavirin is significantly impaired in renal insufficiency; thus, the risk of adverse effects, particularly hemolytic anemia, increase significantly with a decline in renal function. Ribavirin dose should be reduced with impaired renal function (creatinine > 1.5 mg/dL), and ribavirin is contraindicated if the creatinine is > 2.0 mg/dL, or the creatinine clearance is < 50 ml/min. Ribavirin is absolutely contraindicated in dialysis patients, since

it is not dialyzable. Ribavirin also causes histamine-like side effects such as nasal stuffiness, itching, and skin irritations. More severe effects can include an asthma-like syndrome or bronchitis.

> **Ribavirin may cause fetal abnormalities. All female inmates of childbearing potential must have a pregnancy test prior to initiating therapy. Both women AND men must be counseled to use adequate birth control during treatment and for 6 months after treatment is completed.** Counseling of both women AND men regarding the risk of birth defects is particularly important for inmates awaiting release and receiving ribavirin or who have recently completed treatment.

**Monitoring treated inmates:** Inmates receiving interferon and ribavirin should be monitored as follows:

- **Clinician evaluations:** Clinician evaluations should occur weekly for one month, then monthly thereafter, to assess drug side effects and potential complications. Inmates with compensated cirrhosis, HIV infection, and other co-morbid conditions require more frequent monitoring, as do patients who develop significant side effects or complications while on therapy. Psychiatry and psychology consultations should be provided as clinically indicated while inmates are taking interferon.

- **Laboratory monitoring:** Inmates receiving interferon and ribavirin therapy should be monitored for drug toxicities in accordance with the following general guidance:

    - ALT at weeks 1, 2, and 4, and at 8-12 week intervals thereafter;
      (An unusual but serious complication of interferon or interferon and ribavirin combination therapy is the paradoxical worsening of hepatitis. If ALT levels increase significantly, antiviral therapy should be discontinued, ALT levels should be monitored closely, and the inmate should be monitored for signs and symptoms of hepatitis.)
    - Periodic bilirubin, prothrombin time, and serum chemistries, including creatinine/BUN repeated with any new elevations in ALT or symptoms or signs of liver disease;
    - CBC with differential/platelet count at weeks 1, 2, and 4, and at 4-8 week intervals thereafter; and
    - Thyroid function studies every 3 months during interferon therapy.

**Treatment duration and maintenance:** The recommended duration of interferon and ribavirin antiviral therapy and the assessment of treatment response varies with HCV genotypes and is assessed by the clearance of HCV RNA. An early viral response (EVR) is indicated by a 2 log decrease in viral load after 4-12 weeks of treatment. A sustained viral response (SVR) is indicated by the absence of detectable HCV RNA in the serum measured by a nucleic acid test 24 weeks after completion of antiviral therapy.

- **Genotypes 1, 4, 5, and 6:** Antiviral therapy for hepatitis C is administered for 12 weeks for inmates with HCV genotypes 1, 4, 5, or 6, followed by the measurement of quantitative

HCV RNA. A detected EVR in persons infected with HCV genotype 1, predicts a sustained viral response (SVR). Inmates with an EVR should be treated for another 36 weeks (total 48 weeks course of treatment). (Use the same laboratory and same type of viral load testing when comparing pretreatment and post-treatment levels of HCV RNA.) Failure to achieve an EVR (not suppressing HCV RNA by at least two logs from baseline) predicts treatment failure. **Antiviral therapy should be discontinued in these patients after 12 weeks of treatment.** In the absence of evidenced-based data on treatment response for persons infected with HCV genotypes 4, 5, and 6, inmates with these genotypes should be treated like those with HCV genotype 1.

- **Genotypes 2 and 3:** Patients infected with HCV genotypes 2 or 3 may be effectively treated with 12-24 weeks of therapy. Achieving an SVR after 12 weeks of treatment has the following potential benefits: a decreased duration and severity of medication side effects, lower overall treatment costs, and increasing the number of inmates who could complete antiviral therapy prior to release. The following two options should be considered:

  - **Option 1**
    - Administer antiviral therapy for 4 weeks (pegylated interferon alfa 2a or 2b with ribavirin)
    - Check HCV RNA after 4 weeks of treatment. If undetectable or $\geq$ 2 log decrease from baseline, complete a total of 12 weeks of treatment
    - Confirm that HCV RNA is undetectable at 12 weeks, and again at 6 months post-treatment.
      - If HCV RNA has not shown a $\geq 2$ log decrease at 4 weeks, check the viral load again at 12 weeks.
      - Complete 24 weeks of treatment if HCV RNA is undetectable or $\geq$ 2 log decrease from baseline.
      - Discontinue treatment (nonresponder) if HCV RNA has not shown a $\geq$ 2 log decrease at 12 weeks.

    (In clinical trials, relapse rates were slightly higher in the 12 week vs. 24 week treatment groups. If relapse is detected after a 12 week course of treatment, the same regimen of peg-interferon and ribavirin should be continued for a full 24 weeks.)

  - **Option 2**
    - Administer antiviral therapy for 12 weeks.
    - Check HCV RNA after 12 weeks of treatment.
      - Complete 24 weeks of treatment if HCV RNA is undetectable or $\geq 2$ log decrease from baseline and confirm that HCV RNA is undetectable 6-months post-treatment.
      - Discontinue treatment (nonresponder) if HCV RNA has not shown a $\geq 2$ log decrease at 12 weeks.

**Managing anemia and neutropenia**: The impact of early versus late antiviral dosage reductions and the degree of dose reductions on sustained virologic response has been

evaluated in clinical trials.  A significant reduction in SVR  was only observed in patients who required a reduction in the dose of ribavirin to less than 60 percent of the originally prescribed dose within the first 20 weeks of therapy.  Reducing the dose of peginterferon during the first 20 weeks of treatment had no significant impact on SVR.  Furthermore, reducing the dose of either peginterferon or ribavirin, even to less than 60 percent of the original dose, after 20 weeks of treatment, when patients had undetectable HCV RNA, had no effect on the SVR.

The routine use of erythropoietin or granulocyte colony-stimulating factor (G-CSF) to treat anemia and neutropenia and therefore avoid or ameliorate the need for dose reduction of peginterferon and ribavirin is not recommended due to the lack of definitive indications.  Use of these agents may be approved on a case-by-case basis in consultation with a Central Office physician, based on individual patient characteristics and evidence of an early viral response (EVR) to treatment.  Neither of these agents will correct interferon-induced thrombocytopenia; therefore, dose reduction or discontinuation is essential when platelet counts drop to potentially dangerous levels.  (Recombinant thrombopoietin cannot yet be recommended, due to lack of safety and efficacy data.)

**Re-treatment:**  Patients who do not achieve a SVR following antiviral therapy can be categorized as nonresponders or relapsers.

- **Nonresponders:**  These patients do not adequately respond to antiviral therapy by either:
  1) developing a SVR upon the completion of antiviral therapy; or by
  2) clearing viremia at a rate that predicts a SVR if treatment were continued.

- **Relapsers:**  These patients have undetectable levels of HCV RNA at the end of treatment, but do not attain a SVR, i.e., HCV RNA is detectable by 24 weeks after completion of initially effective antiviral therapy.

Re-treatment of relapsers and nonresponders should be considered on a case-by-case basis with the approval of Central Office HSD, while considering the following:

- **Relapsers should not be retreated with the same regimen.**  Although direct comparison studies have not been performed between the two brands of pegylated interferon, they are considered to be equivalent.  Therefore, a treatment relapser after a course of one pegylated interferon preparation (plus ribavirin) would not necessarily be retreated with the other brand of pegylated interferon.

- **Re-treatment should be considered for those inmates who are most likely to benefit from therapy and are at significant risk of disease progression** by weighing the follow factors in combination:

  - the severity of underlying liver disease determined by liver biopsy;
  - the viral genotype and other predictive factors that influence response rates;
  - the previous regimen and the relative potency of the new regimen (e.g., non-pegylated interferon, interferon monotherapy); and

    – the previous response to therapy.

- **Nonresponders to a standard pegylated interferon and ribavirin regimen will not be retreated.**

- **Long-term antiviral maintenance therapy should not be prescribed** because it is still investigational and has unproven benefits.

**Complicating medical conditions**:

- **Renal insufficiency:** Persons with HCV infection have an increased risk of renal disease that is often associated with cryoglobulinemia, and histologic findings that resemble idiopathic membranoproliferative glomerulonephritis (MPGN). Clinical manifestations include hematuria, proteinuria that is often in the nephrotic range, and a variable degree of renal insufficiency. In the absence of liver disease that warrants antiviral therapy for HCV infection, inmates with moderate to severe kidney disease (e.g., nephrotic syndrome, elevated plasma creatinine concentration, new hypertension, fibrosis or tubulointerstitial disease on biopsy) should still be considered for antiviral therapy for HCV infection. Specific treatment regimens should be individualized in consultation with a Central Office physician and available physician experts.

- **Hemodialysis:** The goal of treating hepatitis C in persons with end-stage renal disease is to reduce the progression of liver disease and/or clear the HCV infection in patients who may later undergo renal transplantation. Evaluation of these patients is complicated by several factors: (1) ALT levels are more likely to be normal or near-normal in hemodialysis patients, even in the presence of significant fibrosis; (2) the need for a liver biopsy must be balanced against the increased risk of severe bleeding; and (3) since interferon is contraindicated after renal transplantation, hepatitis C treatment should be considered prior to referring the inmate for transplant consideration. For dialyzed patients, the recommended dose of pegylated interferon 2a is 135 $\mu$g administered subcutaneously, as monotherapy.

- **HBV and HCV co-infections:** Antiviral therapy for inmates with HBV and HCV co-infections should be initiated with great caution, and only in consultation with a specialist, due to the uncertainty of the risks and benefits of treatment and lack of a recommended treatment regimen. All cases which may be candidates for treatment should be reviewed with a Central Office physician.

- **HIV and HCV co-infections:** Pegylated interferon and ribavirin therapy should be considered for all inmates with chronic hepatitis C and HIV co-infection, since HIV increases the risk of hepatic fibrosis and end-stage liver disease. Treatment response rates, however, are lower in HIV infected patients and the risk of serious adverse effects are greater. **The recommended duration of treatment, assuming an EVR at 12 weeks, is 48 weeks of therapy, regardless of genotype.** The following treatment considerations should also be noted for inmates with HCV/HIV co-infections:

- Treatment for HIV and HCV infections should not be initiated simultaneously.
- Inmates who have not been treated for either HIV infection or chronic hepatitis C should first be treated with antiretroviral therapy if the inmate is a candidate for treatment (AIDS or CD4+ T-cell count < 350 cells/mm$^3$); otherwise consider antiviral therapy for chronic hepatitis C in inmates with documented liver disease.
- Patients with HIV infection are at greater risk of hepatotoxicity with interferon/ribavirin therapy, particularly if they are on a HAART regimen. Ritonavir and nevirapine have been specifically implicated in some studies, although other studies suggest an increased risk with any HAART regimen. ALT levels should be monitored every 1-2 months while on therapy.
- Didanosine (ddI) should not be co-administered with either interferon or ribavirin due to the increased risk of pancreatitis and lactic acidosis.
- Bone marrow suppression from HIV infection or antiretrovirals, such as zidovudine (AZT) may complicate treatment for hepatitis C. In order to avoid severe anemia from ribavirin-induced hemolysis, erythropoietin therapy or an alternative HAART regimen may be warranted.

- **Latent TB and chronic HCV infection:** Inmates with latent TB infection and chronic HCV infection should be considered for isoniazid treatment and should be monitored for hepatotoxicity in accordance with the same guidelines established for patients without HCV infection. All inmates require screening for symptoms of hepatitis while taking isoniazid. Those inmates with baseline ALT elevations, also warrant periodic monitoring of ALT levels. Isoniazid should be discontinued in inmates with marked elevations in ALT levels or significant signs or symptoms of hepatitis in accordance with BOP Guidelines for the Management of Tuberculosis.

## Infection Control

**Patient education:** All inmates should be counseled during orientation to the institution and when appropriate during clinical evaluations of the importance of preventing blood exposures to others during activities of daily living such as sharing toothbrushes and razors and through unsafe behaviors such as injection drug use, tattooing, and sexual contact with other inmates.

**Reporting:** Each institution should have a surveillance system for notifiable infectious diseases in accordance with BOP policy. Acute hepatitis C is a reportable condition in many states. Inmates with acute hepatitis C should be reported to local or state authorities where required and to the Central Office HSD. Inmates with chronic HCV infection should be reported to the local or state health authorities where required.

**Containment:** Inmates with acute hepatitis C and chronic HCV infection do not require isolation, but should be counseled on the specific measures necessary for preventing further transmission of HCV to others during incarceration and upon release and should be managed while incarcerated using standard infection control precautions. Non-disposable patient-care items must be appropriately cleaned, disinfected, or sterilized based on the use; and measures

must taken to prevent cross contamination during patient care, e.g., dialysis, vascular access, cauterizing, dental procedures, etc., in accordance with CDC guidelines.

## Hemodialysis:

- **Screening:** Inmates on hemodialysis without chronic HCV infection should have serum ALT levels measured monthly and anti-HCV measured by an immunoassay semi-annually to screen for newly acquired HCV infection. All inmates receiving hemodialysis with a positive anti-HCV screening immunoassay should have a supplemental qualitative HCV RNA performed.

- **Infection control:** Infection control measures to reduce HCV transmission during hemodialysis should be implemented in accordance with CDC guidelines. Inmates with HCV infection receiving dialysis do not need to be isolated from other patients or dialyzed separately on dedicated machines. Dialyzers used for inmates with HCV infection can be reused.

**Contact investigation:** Contact investigations should be initiated for those inmates with acute hepatitis C who have been incarcerated during the 2 weeks to 6 months prior to disease onset. A contact investigation tool is attached in *Appendix 11a (Contact Investigation - Acute Hepatitis C)* and *Appendix 11b (Line Listing - Acute Hepatitis C)* In addition to documenting medical visits or procedures during which the inmate may have had blood exposure, inmates should be interviewed for information regarding recent drug injection, tattooing or body piercing and sexual contacts. Enhanced case-finding, and counseling and testing for anti-HCV, should be initiated for sexual contacts, injection partners and those who have used the same tattooing equipment.

## Post-exposure Management:

- **Emergent care:** Wounds and skin sites that have been in contact with blood or bloody body fluids should be washed with soap and water. Exposed mucous membranes should be flushed with water. Squeezing the wound and treating with topical antiseptics are not recommended.

- **Counseling:** Inmates with percutaneous or mucosal exposures to blood should be assessed by a qualified health care provider and counseled regarding their risk of acquiring HCV infection, the natural history of HCV infection, and the recommendations for post-exposure management.

- **Post-exposure follow-up:** No vaccine or passive immunization is available to prevent acquisition of HCV infection following an exposure. The following guidelines should be used for managing inmate exposures to HCV:

  - Whenever feasible, the source of the exposure should be tested for anti-HCV, unless the source's infection status is already known.

Table of Contents
FDA Consumer magazine
March-April 1999



EXHIBIT

A

U.S. Food and Drug Administration

# Hepatitis C

## New Treatment Helps Some, But Cure Remains Elusive

*by John Henkel*

Elaine Moreland knew she wasn't imagining the symptoms. Fatigue, migraines, nausea, memory loss, anxiety, and dizziness all were wreaking havoc in her life. Yet doctor after doctor could find nothing wrong with her. Some said she was depressed. Others blamed hypochondria.

Finally, in 1992, after suffering for several years, she went to another doctor in tears. "I told him that I was not leaving his office until he found *something,*" she says. Through extensive testing, he did. Moreland, then 32, had hepatitis C.

The nation's most common blood-borne infection, hepatitis C is estimated to affect some 4 million Americans in its chronic form. Eventually, as many as 70 percent of them will develop liver disease, according to the national Centers for Disease Control and Prevention.

In congressional testimony last year, former Surgeon General C. Everett Koop, M.D., called hepatitis C "a disease these millions will carry for a decade or more--possibly spreading to others--while it develops into a serious threat to their health."

Hepatitis C is one of five currently identified viruses--hepatitis A, B, C, D, and E--all of which can attack and damage the liver. Widely viewed as one of the most serious of the five, the hepatitis C virus (HCV) is spread primarily through contact with infected blood and can cause cirrhosis (irreversible and potentially fatal liver scarring), liver cancer, or liver failure. Hepatitis C is the major reason for liver transplants in the United States, accounting for 1,000 of the procedures annually. The disease is responsible for between 8,000 and 10,000 deaths yearly.



Location of the Liver

Some estimates say the number of HCV-infected people may be four times the number of those infected with the AIDS virus. "One of the main differences is that hepatitis C doesn't kill as quickly as AIDS," says Jay Hoofnagle, M.D., director of digestive diseases and nutrition at the National Institute of Diabetes and Digestive and Kidney Diseases.

Presently, there is no vaccine or other means of preventing hepatitis C infection. HCV exists in many different forms, called genotypes, confounding researchers in their quest to develop a vaccine effective for all variations. Also, HCV mutates frequently within infected patients, so even if an effective vaccine is developed, it could be rendered useless by a new strain of mutant virus.

Once HCV is contracted, treatment or the body's defenses can cure a small portion of patients. In most others,

however, HCV's frequent mutations allow it to evade the immune system, defeating attempts to develop a cure. Some treatments are available, but they don't work for all patients. The most recent is one that combines a genetically engineered biological drug (interferon) with the drug ribavirin.

## Who Is at Risk?

High-risk activities for acquiring hepatitis C include:

- injecting illegal drugs--this risk exists even if the drug abuse only lasted for a short time or occurred many years ago
- receiving organs from donors whose blood contained HCV
- getting pricked with a needle that has infected blood on it--mainly a risk for health-care workers
- frequently being exposed to blood products such as those used to treat hemophilia or chronic kidney failure
- "snorting" cocaine using shared equipment
- getting a tattoo or body piercing with nonsterile instruments that were used on someone infected with HCV
- using an infected person's toothbrush, razor, or anything else that may have blood on it
- engaging in high-risk sexual behavior, such as having multiple partners or failing to use condoms.

In the recent past, people receiving blood transfusions were a main risk group for HCV infections. That is because before 1990, there was no way to reliably screen the blood supply for the virus, so many were unwittingly infected. At the time, the risk of HCV infection was about 1 in 200 units of blood, says CDC. In May 1990, the Food and Drug Administration licensed an enzyme immunoassay (EIA) test for HCV, which indicates the presence of HCV antibodies in blood samples. But this test had a high rate of false positives (see "Identifying Recipients of Contaminated Blood."). Two years later, the agency approved a more sensitive and reliable EIA test, which has helped lower the odds of contracting hepatitis C from donated blood to 1 in 100,000 units. In February, FDA approved an improved test for confirming positive results from screening tests.

Acquiring HCV through sex between monogamous partners has not been conclusively demonstrated and appears to be rare. Studies have shown that less than 5 percent of spouses of patients with chronic hepatitis C become infected. But some of these studies include data from countries where hepatitis C is common in the general population. Likewise, transmission of HCV from infected mother to infant also is rare and results in infection of the infant in only about 5 percent of cases. There is no evidence that breast-feeding spreads HCV.

In about 10 percent of acute hepatitis C cases and 30 percent of chronic cases, the source of the infection cannot be identified. These "sporadic" infections, says the National Institute of Diabetes and Digestive and Kidney Diseases, are likely caused by infection through contamination of cuts, wounds or medical injections with the blood or body fluids of infected persons. Also, some infected patients may not provide truthful information about potential exposure, especially regarding past drug abuse. Further, some health experts say there may be an as-yet unknown pathway for the virus. Most experts agree, however, that HCV cannot be acquired through casual contact with an infected person such as shaking hands, hugging, or even kissing. It also is not spread by sneezing, coughing, or sharing eating utensils or drinking glasses.

## Treating the Disease

Some patients learn they have hepatitis C through a routine physical or when they donate blood and a blood test shows elevated liver enzymes. Others have symptoms (see "Hepatitis C: Types and Symptoms."). Further testing for HCV antibodies using the EIA test and a supplemental test such as the "Western blot" or HCV-RNA detection can positively identify the infection. A liver biopsy shows disease manifested by damage already done

to the liver.

Once diagnosed, CDC recommends the following:

- Stop using alcohol.
- See a doctor regularly.
- Don't start any new medicines or use over-the-counter, herbal, or other drugs without consulting with a doctor.
- Get vaccinated against hepatitis A, a food- and water-borne virus, if liver damage is present.

One of the only approved treatments for chronic hepatitis C, especially for patients with consistently elevated liver enzymes or mild-to-moderate liver damage, is the biological drug interferon alpha, marketed as Intron A by Schering Corp. and Roferon-A by Roche Laboratories Inc. Amgen Inc. also has an approved drug derived from interferon alpha called Infergen. Hepatitis C patients must inject interferon themselves, usually three times a week. In about 25 percent of patients, the drug has a pronounced effect, reducing HCV to very low levels in the blood. However, if the drug is ineffective after three months, doctors probably will discontinue it.

Doctors also may prescribe Rebetron, a Schering product that combines interferon with the antiviral drug ribavirin. Approved last June for patients who have relapsed after interferon therapy and expanded in December to include patients never treated with interferon, this combination therapy appears to suppress blood levels of HCV more effectively than a first or repeat course of interferon alone. In clinical trials, about 45 percent of relapsed patients treated with the combination sustained reduced HCV levels for six months after discontinuing therapy, compared with 5 percent of relapsed patients who were retreated with interferon alone. These results were reinforced by a study published last Nov. 19 in the *New England Journal of Medicine* showing the combination to be significantly more effective in suppressing HCV levels.

"We've learned from research in other viral diseases that combination therapies rather than [a single drug] may offer the best potential for effective treatment," says John Hutchison, M.D., medical director of liver transplantation at Scripps Clinic and Research Foundation.

Bill Ruttman, 44, a Lansdale, Pa., hepatitis C patient, has taken the combination treatment since last October. As a result, his HCV levels have dropped to undetectable levels, and his once-elevated liver enzyme levels have "normalized," which he says is good news because for now, he feels the disease has been slowed down. "I'm extremely happy in that regard," he says.

Ruttman's successful therapy has come at a price, however, because of Rebetron's side effects. He suffers from extreme fatigue and has to nap often during the day, and he sleeps restlessly at night. He also has bouts of depression and is currently unable to work. His side effects are typical of those experienced by patients taking interferon alone as well as the combination therapy.

Because side effects can be serious, patients should be closely monitored by their doctors. Ribavirin can cause anemia, and interferon is associated with both psychosis and suicidal behavior, though the latter occurs in 1 to 2 percent of patients. Both interferon and ribavirin present significant potential risks for pregnant women, including possible fetal death or malformations. Female patients and female partners of male patients must not become pregnant while receiving this therapy and for six months after completing therapy.

Some patients who take interferon or the combination complain of flu-like side effects such as fever, chills and body aches. Many side effects, such as muscle aches and low-grade fever, can be managed. Some side effects may be reduced by giving the drug at night or lowering the dosage. Side effects are often more severe during the first few weeks of treatment, especially after the first injection.

Patient Elaine Moreland says her interferon therapy caused "just about every one of the [side effects] listed in the drug handout sheets--severe muscle cramps, hair loss, nervousness, heart palpitations, fatigue, sweating, headaches, and blurry vision." Ultimately, she says, treatment was stopped because it wasn't working. Because of the potential side effects, she is holding off on further therapy in the hope that improved treatments may soon be available. "I'm waiting to see what comes down the pike unless signs start to point to serious progression of my disease."

Currently, chronic hepatitis C patients who do not respond to therapy have few options. In many, cirrhosis or other damage will eventually cause the liver to stop functioning. In these cases, a liver transplant is the only recourse. However, even new livers often become infected with the virus. But because HCV usually progresses slowly, says Jay Hoofnagle, many transplant recipients can live normal lives for many years despite the infection.

## On the Horizon

A major focus of hepatitis C research is development of a cell culture through which scientists can study HCV outside the human body. By understanding how the virus replicates and how it injures cells, researchers may be able to develop ways to control the virus as well as drugs to block it.

Several drugs currently under study show some promise as future treatments for the disease. They include thymosin, amantadine, and other forms of interferon.

"What we really need, of course, is a vaccine against this disease," Surgeon General David Satcher, M.D., told a congressional committee last year. "However, we cannot underestimate the complexity of this task, particularly because of the rapid rate at which the virus mutates." Researchers at the National Institute of Allergy and Infectious Diseases say a vaccine is likely 10 years away.

One research hurdle was cleared in 1997 when NIAID scientists and FDA researcher Stephen Feinstone, M.D., independently cloned an infectious hepatitis C virus. NIAID director Anthony Fauci, M.D., says the work "will enable scientists to better understand the factors and mechanisms that determine whether the virus is cleared from the body or produces a chronic infection."

Another obstacle to research progress is the need for more funding. Though hepatitis C has taken a back seat in recent years to appropriations for many other more visible public health problems such as AIDS, the situation is improving. Direct funding for hepatitis C research at the National Institutes of Health was $25.3 million in 1997, but has increased to over $34 million in 1999. Private efforts have bolstered funding as well. For example, country music entertainer Naomi Judd, herself a hepatitis C patient who was forced to retire in 1991, started the Naomi Judd Research Fund to help find a cure for the disease. Through the fund, she has helped the American Liver Foundation raise over a million dollars.

Meanwhile, federal and private groups are escalating efforts to educate primary care physicians and the public about the disease. And through the Internet and local support groups, hepatitis C sufferers are finding what patient Bill Ruttman calls "a community."

As for those just diagnosed with the disease, patient Elaine Moreland has this advice: "Try to find a good doctor who is knowledgeable about HCV. Become active in your own medical treatment. Read all you can about the disease. Above all, try to keep a positive attitude and know you're not alone in the fight."

*John Henkel is a staff writer for FDA Consumer.*

# The Five Faces of Hepatitis

Scientists have currently identified five different hepatitis viruses. All are serious infections that can attack and damage the liver. (The information below is also available as a 7K PDF file.)

## Hepatitis A

How It Is Spread: By drinking water or eating food contaminated with fecal material that contains the virus.

Symptoms: Flu-like symptoms such as fatigue, nausea, vomiting, abdominal discomfort, dark urine, and jaundice (yellowing of the skin and eyes). Liver tests may be elevated.

Treatment: Bed rest and avoidance of intimate contact. Can last between three weeks and six months. Two approved vaccines: immune globulin for short-term protection and for patients already exposed, and hepatitis A vaccine for long-term protection.

## Hepatitis B

How It Is Spread: Exposure to infected blood, unprotected sex with an infected person, sharing contaminated needles, and travel to countries with a high rate of infection. Infected mothers also may infect newborns.

Symptoms: Loss of appetite, nausea, vomiting, fever, fatigue, abdominal pain, dark urine, or jaundice. No symptoms in some people.

Treatment: Interferon alpha. A vaccine--recommended for newborns, infants, and teenagers--provides immunity for at least five years.

## Hepatitis C

How It Is Spread: Direct contact with human blood, which can occur from being pricked accidentally by a contaminated needle, injecting illegal drugs, and sharing razors or toothbrushes with an infected person.

Symptoms: More than half have no symptoms. Others have appetite loss, fatigue, nausea, fever, dark-yellow urine, and jaundice. Liver tests may be elevated.

Treatment: Interferon or a combination of interferon and the drug ribavirin. No vaccine.

## Hepatitis D

How It Is Spread: Contact with infected blood. Requires the hepatitis B virus to replicate, so it infects either at the same time as hepatitis B or those who already have hepatitis B.

Symptoms: Same as for hepatitis B but typically more severe: appetite loss, fatigue, nausea, vomiting, abdomina pain.

Treatment: Interferon alpha for hepatitis B may have some effect.

**Hepatitis E**

How It Is Spread: Water contaminated with fecal material, especially in developing countries, and contaminated uncooked shellfish, fruits and vegetables.

Symptoms: Abdominal pain, dark urine, fever, jaundice, nausea, and vomiting.

Treatment: Bed rest. No drug treatment or vaccine.

# Identifying Recipients of Contaminated Blood

Before 1992, tests to detect antibodies to the hepatitis C virus in the nation's blood supply were unreliable or nonexistent. As a result, many patients who received blood then may have contracted the virus unknowingly. To identify them so they can receive treatment, the Department of Health and Human Services is sponsoring a "lookback" program that is tracking down and informing about 300,000 people who received suspected HCV-contaminated blood before 1992. HHS agencies, including FDA and the Health Care Financing Administration, will ensure that recipients of blood that initially tested negative for antibodies to HCV, but was collected from donors who later tested positive for the antibodies, are informed by letter that they may have received blood containing HCV. As part of the lookback program, the national Centers for Disease Control and Prevention is leading educational programs for health-care professionals and the public to bring greater awareness of the disease.

--J.H.

# Hepatitis C: Types and Symptoms

Infection with hepatitis C may cause symptoms right away, not for years, or sometimes not at all. With the *acute* form of the disease, symptoms such as fatigue, nausea, and dark urine typically show up within six months. About one-fourth of patients with acute hepatitis C recover completely with treatment. But according to the National Institute of Diabetes and Digestive and Kidney Diseases, the other estimated 75 percent of these patients will progress eventually to the long-term, or *chronic*, form of the disease, with detectable HCV in their blood.

Chronic hepatitis C, however, varies widely in its severity and outcome. It can lie dormant for 10 years or more before symptoms appear. Some patients will have no symptoms of liver damage, and their liver enzymes will stay at normal levels (elevated enzymes are one indication of liver disease). A liver biopsy, in which the doctor removes a tiny piece of liver with a needle, may show some degree of chronic hepatitis, but it may be mild.

Other patients, however, will have severe hepatitis C, with detectable HCV in their blood, liver enzymes elevated as much as 20 times more than normal, and a prognosis of ultimately developing cirrhosis and end-stage liver disease. Another group of patients falls somewhere in the middle, with few or no symptoms, mild- to-moderate elevation of liver enzymes, but with an uncertain prognosis.

According to the National Institute of Diabetes and Digestive and Kidney Diseases, at least 20 percent of chronic hepatitis C patients develop cirrhosis, but this process can take 10 to 20 years from the onset of infection. As

many as 5 percent of chronic patients, after 20 to 40 years, develop liver cancer. Other studies show that those with cirrhosis develop liver cancer within 17 years.

Patients with no symptoms sometimes learn they have the disease when a routine physical or blood donation shows elevated levels of liver enzymes, which can indicate hepatitis C, as well as other liver disorders.

Other patients, however, have symptoms that prompt them to seek medical attention, including:

- yellowish eyes or skin (jaundice)
- fatigue, or an extreme feeling of being tired all the time
- pain or tenderness in the right upper quadrant of the body
- persistent nausea or pains in the stomach
- lingering fever
- loss of appetite
- diarrhea
- dark yellow urine or light-colored stools
- If you have any of these symptoms, see a doctor right away.

*--J.H.*

# For More Information

Contact any of the following organizations for more on hepatitis C, its treatment, support groups, and Internet mailing lists.

American Liver Foundation
1425 Pomptom Ave.
Cedar Grove, NJ 07009
1-800-GO LIVER (1-800-465-4837)

Hepatitis C Foundation
1502 Russett Drive
Warminster, PA 18974
215-672-2606

Hepatitis Foundation International
30 Sunrise Terrace
Cedar Grove, NJ 07009-1423
1-800-891-0707
www.hepfi.org

National Digestive Diseases Information Clearinghouse
2 Information Way
Bethesda, MD 20892-3570
301-654-3810
www.niddk.nih.gov

In addition, two helpful publications are available on-line from the national Centers for Disease Control and

Prevention or by calling CDC at (404) 332-4555:

- Hepatitis C Fact Sheet--www.cdc.gov/ncidod/diseases/hepatitis/c/fact.htm
- Hepatitis C Questions and Answers--www.cdc.gov/ncidod/diseases/hepatitis/c/faq.htm

---

Table of Contents | How to Subscribe | Back Issues | FDA Home Page

Office of Public Affairs
Web page created by ckc 1999-FEB-10.





Advanced Search

| HOME | CONDITIONS A TO Z | SMART PATIENT GUIDE | HEALTHY LIVING | OTC GUIDE | WOMEN | MEN | PARENTS & KIDS | SENIORS | ABOUT THIS SITE |

familydoctor.org Home > Conditions A to Z > Infections > Hepatitis C

## Hepatitis C

- ► What is hepatitis?
- ► How does hepatitis affect the liver?
- ► What is hepatitis C?
- ► I've never used IV drugs or been stuck with a dirty needle. How did I get hepatitis C?
- ► Could I give hepatitis C to someone else?
- ► How should I take care of myself if I have hepatitis C?
- ► Is there a vaccine for hepatitis C?
- ► Is there a treatment for hepatitis C?
- ► What should I know about interferon?
- ► What side effects will I have?
- ► Do I have to take interferon?
- ► How will I know if my treatment works?
- ► How can I cope with my feelings about having hepatitis C?

# Hepatitis C
## What is hepatitis?

 Printer-friendly version

✉ Email this article

ESP Spanish / Español

Hepatitis is an inflammation of the liver. Inflammation causes soreness and swelling. Hepatitis can be caused by many things. Lack of blood supply to the liver, poison, autoimmune disorders, an injury to the liver, and taking some medicines can cause hepatitis. However, hepatitis is most commonly caused by a virus.

There are 2 main kinds of hepatitis, acute hepatitis and chronic hepatitis. When a person has hepatitis, the liver may become inflamed very suddenly. This is called acute hepatitis. If you have acute hepatitis, you might have nausea, vomiting, fever and body aches. Or you may not have any symptoms. Most people get over the acute inflammation in a few days or a few weeks. Sometimes, however, the inflammation doesn't go away. When the inflammation doesn't go away, the person has chronic hepatitis.

Return to top

## How does hepatitis affect the liver?

The liver breaks down waste products in your blood. When the liver is inflamed, it doesn't do a good job of getting rid of waste products. One waste product in the blood, called bilirubin (say "billy-roo-bin"), begins to build up in the blood and tissues when the liver isn't working right. The bilirubin makes the skin of a person with hepatitis turn a yellow-orange color. This is called jaundice (say "john-dis"). Bilirubin and other waste products may also cause itching, nausea, fever and body aches.

Return to top

## What is hepatitis C?

There are 3 viruses that cause hepatitis. Each hepatitis virus is named with a letter of the alphabet: hepatitis A, hepatitis B and hepatitis C. Hepatitis C is usually spread through contact with blood products, like accidentally being stuck with a dirty (used) needle, using IV drugs and sharing needles, or getting a blood transfusion before 1992. Most people don't feel sick when they are first infected with hepatitis C. Instead, the virus stays in their liver and causes chronic liver inflammation.

Most people who are infected with hepatitis C don't have any



Infections Home Page

Hepatitis A

Hepatitis B and C

American Liver Foundation
75 Maiden Lane, 603
New York, NY 10 4810
800-GO-LIVER

EXHIBIT
tabbies
B

symptoms for years. However, hepatitis C is a chronic illness (it doesn't go away). If you have hepatitis C, you need to be watched carefully by a doctor because it can lead to cirrhosis (a liver disease) and liver cancer.

Return to top

## I've never used IV drugs or been stuck with a dirty needle. How did I get hepatitis C?

Hepatitis C is usually spread through direct contact with the blood of a person who has the disease. Many times, the cause of hepatitis C is never found. This virus can be transmitted through sex. It can also be passed from one person to another by living in the same house with someone who has hepatitis C. Sharing razors or toothbrushes can transmit the hepatitis C virus. It can be transmitted by tattoo needles. It can even be passed from a mother to her unborn baby. All of these ways of catching hepatitis C are uncommon, but they do occur.

Hepatitis C can't be spread unless a person has direct contact with infected blood. This means a person who has hepatitis C can't pass the virus to others through casual contact such as sneezing, coughing, shaking hands, hugging, kissing, sharing eating utensils or drinking glasses, swimming in a pool, using public toilets or touching doorknobs.

Return to top

## Could I give hepatitis C to someone else?

Yes, as far as we know, once you have hepatitis C, you can always give it to someone else. If you have hepatitis C, you can't donate blood. You should avoid sharing personal items like razors and toothbrushes. Always use a condom when you have sex. If you have hepatitis C, your sex partners should be tested to see if they also have it.

Talk to your doctor first if you want to have children. The virus isn't spread easily by sexual contact or from a mother to her unborn baby. If you're trying to have a baby, don't have sex during the menstrual cycle, because the hepatitis C virus spreads more easily in menstrual blood.

Return to top

## How should I take care of myself if I have hepatitis C?

You should eat a healthy diet and start exercising regularly. A dietitian can help you plan a diet that is healthy and practical. Talk to your doctor about medications that you are taking, including over-the-counter medications. Many medicines, including acetaminophen (brand name: Tylenol) are broken down by the liver and may increase the speed of liver damage. It is very important that you drink only a minimal amount of alcohol. An occasional alcoholic drink is probably OK, but check with your doctor first.

Return to top

## Is there a vaccine for hepatitis C?

No, not for hepatitis C. There are vaccines for hepatitis A and hepatitis B. If you have hepatitis C, your doctor may want you to take the vaccine for hepatitis B (and maybe the vaccine for hepatitis A), if you don't already have these viruses. If you have hepatitis C, you are more likely to catch hepatitis A or hepatitis B, and that would cause more damage to your liver.

Return to top

### A note about vaccines

Sometimes the amount of a certain vaccine cannot keep up with the number of people who need it. **More info...**

Return to top

## Is there a treatment for hepatitis C?

Good health habits are essential for those who have hepatitis C, especially avoidance of alcohol and other medications and drugs that can harm the liver. Although there is not yet a proven cure for hepatitis C, some people benefit from drug treatment. You should discuss treatment with a doctor if you have hepatitis C. Standard medicines available include the following:

- peginterferon alfa-2b (brand name: PEG-Intron)
- peginterferon alfa-2a (brand name: Pegasys)

These medicines are given as a weekly shot. You may or may not need to use a ribavirin supplement in pill form (some brand names: Copegus, Rebetol, Virazole) along with interferon.

Other medicines available to treat hepatitis C include the following:

- interferon alfa-2a (brand name:Roferon-A)
- interferon alfa-2b (brand name: Intron A)
- interferon alfacon-1 (brand name: Infergen)
- interferon alfa-2b plus ribavirin (brand name: Rebetron)

These medicines are given as a shot every day, every other day or 3 times a week, for several months or longer. The length of treatment depends on how severe the infection is. Carefully following your doctor's advice and sticking with your treatment plan will reduce your risk of further liver damage.

Return to top

## What should I know about interferon?

Before you can start taking interferon, you will have a liver biopsy. A tiny bit of your liver will be taken out in a surgical operation. The

doctor will check this sample of your liver to see how much damage there is. Younger patients with mild liver disease and fewer virus particles in the liver have a better response to interferon.

Interferon is expensive. It costs about $6,000 a year. You should check with your health insurance provider to see if your medical insurance will cover the cost.

Return to top

## What side effects will I have?

Side effects of interferon therapy may include the following:

- Weight loss
- Trouble sleeping
- Chest pain
- Nausea/vomiting
- Fever and body aches
- Extreme tiredness
- Irritability
- Depression

Side effects of ribavirin supplements may include the following:

- Decrease in red blood cells (anemia)
- Skin rashes/itching
- Worsening of heart/circulatory problems
- Extreme tiredness

Side effects are usually worst during the first few weeks of treatment and become less severe over time. If you are having trouble dealing with the side effects of your medicine, talk to your doctor. He or she can suggest ways to relieve some of the side effects. For example, if your medicine makes you feel nauseated, it may help to take it right before you go to sleep.

If taking medicine to treat hepatitis C makes you feel worse than the actual disease does, you may be tempted to stop taking your medicine before your treatment is done. However, if you don't prevent chronic inflammation from damaging your liver, you'll be much sicker in the long run. Don't stop taking your medicine until your doctor tells you to.

Return to top

## Do I have to take interferon?

The choice is up to you and your doctor. Some people with hepatitis C don't have any symptoms. They only have a little inflammation of their liver. If you have hepatitis C but no symptoms, your doctor will want to keep a close watch on you. This is done by checking your blood at least once a year, and maybe 3 times a year. Your doctor will check the level of 2 enzymes that are made in your liver. Your doctor might decide to give you medicine for hepatitis C only if these enzymes reach a certain level.

The decision to use interferon therapy can be hard to make because of the expense and the side effects. Your doctor will pay attention to the type of the virus and the amount of the virus in your body. Your overall health and the results of your blood tests and the liver biopsy are also important to know about before your doctor gives you interferon treatment.

Return to top

## How will I know if my treatment works?

The goal of treatment is to reduce the amount of the hepatitis C virus in your blood to levels that can't be detected after 24 weeks of therapy. The amount of the virus in your blood is called your viral load. At the end of your treatment, your doctor will need to measure your viral load and find out how healthy your liver is. He or she may repeat many of the same tests that were done when you were first diagnosed with hepatitis C.

If your blood has so few copies of the virus that tests can't measure them, the virus is said to be undetectable. If it stays undetectable for at least 6 months after your treatment is finished, you have what is called a sustained virologic response (SVR). People who have an SVR have a good chance of avoiding serious liver problems in the future.

If treatment doesn't reduce your viral load, or if you don't have an SVR after treatment, your doctor will discuss other treatment options with you. For example, if you have been treated with interferon alone, you will probably be treated with interferon plus ribavirin. Even if treatment doesn't keep you from having active liver disease, lowering your viral load and controlling chronic liver inflammation may help you feel better for a longer time.

Return to top

## How can I cope with my feelings about having hepatitis C?

Coping with hepatitis C isn't easy. You may feel sad, scared or angry, or you may not believe you have the disease. These feelings are normal, but they shouldn't keep you from living your daily life. If they do—or if they last a long time—you may be suffering from depression. People who are depressed have most or all of the following symptoms nearly every day, all day, for 2 or more weeks:

- Feeling sad or crying often (depressed mood)
- Losing interest in daily activities that used to be fun
- Changes in appetite and weight
- Sleeping too much or having trouble sleeping
- Feeling agitated, cranky or sluggish
- Loss of energy
- Feeling very guilty or worthless
- Problems concentrating or making decisions
- Thoughts of death or suicide

Talk to your doctor if you notice any of these symptoms. Your doctor can help by recommending a support group or a therapist, and/or by

prescribing a medicine for you to take.

Return to top

Written by familydoctor.org editorial staff.

## Source

American Academy of Family Physicians

Hepatitis C: Part II. Prevention Counseling and Medical Evaluation (*American Family Physician* January 15, 1999, http://www.aafp.org/afp/990115ap/349.html)

Return to top

🖳 Printer-friendly version

✉ Email this article

ESP Spanish / Español

Reviewed/Updated: 6/06
Created: 09/00

This article provides a general overview on this topic and may not apply to everyone. To find out if this article applies to you and to get more information on this subject, talk to your family doctor.

Copyright © 2000-2006 American Academy of Family Physicians
For private, noncommercial use only.
Home | Privacy Policy | Contact Us | About This Site | What's New



Advanced Search                    Log In



AAFP Home Page > News & Publications > Journals > American Family Physician® > Vol. 59/No. 2 (January 15, 1999)

✉ Email Th

🔍 Search A

📖 Browse l



PUBLISHED BY THE AMERICAN ACADEMY OF FAMILY PHYSICIANS          JANUARY 15, 1999

▶ MEDLINI
 • Citation
 • Related .

▶ MORE IN
 • Antiviral
   Agents (
 • Hepatitis
 • Interfero

▶ MORE B
 • Moyer L/
   AFP  ME
 • Mast EE
   AFP  ME
 • Alter MJ
   AFP  ME

# Hepatitis C: Part II. Prevention Counseling and Medical Evaluation

> ⭕ A patient information handout on hepatitis C, written by the authors of this article, is provided on page 357.

LINDA A. MOYER, R.N., ERIC E. MAST, M.D., M.P.H., and MIRIAM J. ALTER, PH.D.

Centers for Disease Control and Prevention, Atlanta, Georgia

An estimated 3.9 million Americans are infected with hepatitis C virus (HCV), and most do not know that they are infected. This group includes persons who are at risk for HCV associated chronic liver disease and who also serve as reservoirs for transmission of HCV to others. Because there is no vaccine to prevent HCV infection and immune globulin is not effective for postexposure prophylaxis, prevention of HCV infection is paramount. Patients who are at risk of exposure to HCV should be advised on steps they might take to minimize their risk of infection. Patients who are infected with HCV should be counseled on ways to prevent transmission of HCV to others and to avoid hepatotoxins. They should also be examined for liver disease and referred for treatment, if indicated.

**See editorial on page 273.** $\text{T}$here is no vaccine to prevent hepatitis C virus (HCV) infection, and immune globulin is not effective for postexposure prophylaxis.[1] In the absence of effective preventive measures and considering the long-term infectious nature of the disease, it is important that those who test positive for hepatitis C antibody (anti-HCV) be advised on how they can avoid infecting others. Because no tests are available to determine infectivity, it should be assumed that anyone testing positive for anti-HCV is potentially infectious.[2] Primary health care professionals should obtain a history of high-risk exposures associated with the transmission of HCV and other blood-borne pathogens from all patients. HCV specific information and prevention messages should be provided to infected patients by health care professionals who are knowledgeable about HCV transmission. All such patients should be told that HCV is transmitted primarily by exposure to blood, serum-derived

body fluids and body fluids that are visibly contaminated with blood. They should be told what this information means in terms of their day-to-day living and in terminology that they can understand. Patients who are at risk of exposure to HCV should be advised about steps they might take to minimize their risk of becoming infected. The primary measures available to prevent HCV infection are screening of blood, organ and tissue donors; modification of high-risk practices; and use of blood and body-fluid precautions.[2]

*What prevention messages should be given to patients with high-risk drug or sexual practices?*

Persons who use or inject illegal drugs should be advised to stop using and injecting drugs. They should be strongly urged to enter and complete substance abuse treatment, including relapse prevention programs.[3,4] If they continue to inject drugs, they should be advised never to reuse or share syringes, needles, water or drug preparation equipment. If injection

> Currently no tests are available to determine infectivity; therefore, anyone who is positive for hepatitis C antibody has the potential to transmit the virus to another person.

equipment has been used by other persons, the equipment should be cleaned first with bleach and water. Only syringes obtained from a reliable source (e.g., pharmacies) should be used. A new, sterile syringe should be used to prepare and inject drugs. If possible, sterile water should be used to prepare drugs; otherwise, clean water from a reliable source, such as fresh tap water, can be used. A new or disinfected container ("cooker") and a new filter ("cotton") should also be used to prepare drugs. The injection site should be cleaned before the injection with a new alcohol swab. Syringes should be safely disposed of after one use.[3,4] These persons should be advised to get vaccinated against hepatitis A[5] and hepatitis B.[6]

Patients who are at risk for sexually transmitted diseases (STDs) should be advised that the surest way to prevent the spread of HIV infection and other STDs is to have sex with only one uninfected partner or not to have sex at all. Patients should be advised to use latex condoms correctly and every time to protect them and their partners from diseases spread by having sex. These patients should also be vaccinated against hepatitis B[6] and, if appropriate, hepatitis A.[5]

*What information should be given to patients who are HCVpositive?*

To protect their liver from further harm, HCVpositive patients should be advised to avoid alcohol,[7,8] not to start taking any new medicines, including over-the-counter and herbal medicines, without checking with their doctor and to get vaccinated against hepatitis A if liver disease is found to be present.[5] To reduce the risk of transmission to others, HCVpositive patients should be

> The average rate of HCV infection among infants born to HCVinfected women is 5 percent. Breast feeding is not a source of hepatitis C virus transmission.

advised not to donate blood, organs, tissue or semen, not to share toothbrushes, dental appliances, razors or other personal care articles that might have blood on

them and to cover cuts and sores on the skin to keep from spreading infectious blood or secretions.[2] HCVpositive patients with one long-term, steady sex partner do not need to change their sexual practices. They should, however, discuss the risk (which is low but not absent) with their partner. If they want to lower the small chance of spreading HCV to their partner, they may decide to use barrier precautions such as latex condoms. These patients should also discuss with their partner the need for counseling and testing.[4]

HCVpositive women do not need to avoid pregnancy or breast feeding. Potential, expectant and new parents should be advised that about five of every 100 infants born to HCVinfected women become infected. This infection occurs at the time of birth, and no treatment can prevent this from happening.[4,9] Infants infected with HCV at the time of birth seem to do very well in the first few years of life. More studies are needed to find out if these children will be affected by the infection as they grow older. There is no evidence that mode of delivery is related to transmission; therefore, the need for cesarean section versus vaginal delivery should not be determined on the basis of HCV-infection status.

> Treatment with interferon is currently recommended for patients who have a consistently elevated ALT level, detectable levels of HCV RNA and a liver biopsy showing evidence of fibrosis or active inflammation and necrosis.

Limited data on breast feeding indicate that it does not transmit HCV, although it may be prudent for HCVpositive mothers to abstain from breast feeding if their nipples are cracked or bleeding. Infants born to HCV positive women should be tested for HCV infection and, if positive, evaluated for the presence or development of chronic liver disease (see the section on testing of children born to HCVpositive women in part I of this article). If an HCVpositive woman has given birth to any children since becoming infected with HCV, she should consider having these children tested.[4]

Other messages should be given to all patients with HCV infection: that HCV is not spread by sneezing, hugging, coughing, food or water, sharing eating utensils or drinking glasses, or casual contact. Persons should not be excluded from work, school, play, child care or other settings on the basis of HCV infection status. Involvement with a support group may help patients cope with hepatitis C.[4] HCV-positive persons should be evaluated (through referral or consultation, if appropriate) to assess for biochemical evidence of chronic liver disease. These patients should be assessed for severity of disease and possible treatment according to current practice guidelines in consultation with, or by referral to, a specialist knowledgeable in this field. The need for hepatitis A vaccination should be determined.[4,5]

*What recommendations should be provided for follow-up care of a health care worker who has experienced a percutaneous or permucosal exposure to blood?*

**TABLE 1**
Postexposure Follow-up of

Hepatitis C: Part II. Prevention Counseling and Medical Evaluation - January 15, 1999 - America... Page 4 of...

Case 1:06-cv-01855-JDB    Document 14-5    Filed 02/20/2007    Page 18 of 28...

Individual institutions should establish policies and procedures for HCV testing of persons after such exposures. Institutions should ensure that all personnel are familiar with these policies and procedures. Health care professionals who provide care to persons exposed to HCV in the occupational setting should be knowledgeable about the risk for HCV infection and able to provide appropriate counseling, testing and medical follow-up.

Immune globulin and antiviral agents are not recommended for postexposure prophylaxis of hepatitis C. Limited data indicate that antiviral therapy might be beneficial when started early in the course of HCV infection, but no guidelines exist for administration of therapy during the acute phase of infection. When HCV infection is identified early, the patient should be referred for medical management to a specialist knowledgeable in this field. Recommendations for follow-up care for HCV infection in exposed health care providers are listed in *Table 1.*[4,10]

*Are there recommended practice restrictions for anti-HCV positive health care workers?*

There are currently no recommendations regarding restriction of health care workers with hepatitis C. The risk of transmission from an infected employee to a patient appears to be very low.[4,10]

---

**Health Care, Emergency Medical, and Public Safety Workers for HCV Infection**

For the source patient--baseline testing for anti-HCV

For the person exposed to an HCV-positive source--baseline and follow-up testing, including the following:

> Baseline testing for anti-HCV and ALT activity

> Follow-up testing for anti-HCV (at four to six months) and ALT activity. (If earlier diagnosis of HCV infection is desired, testing for HCV RNA may be performed at four to six weeks.)

> Confirmation by supplemental anti-HCV testing of all anti-HCV results reported as positive by enzyme immunoassay.

---

Anti-HCV=hepatitis C virus antibody; HCV=hepatitis C virus; ALT=alanine aminotransferase.

Information from references 4 and 10.

---

*Should hepatitis A and hepatitis B vaccines be given to persons with chronic hepatitis C?*

Susceptible patients with chronic liver disease should receive hepatitis A vaccine. Susceptible patients in a high-risk group for which hepatitis B vaccine is recommended should also receive hepatitis B vaccine.[4-6]

## Treatment of HCV Infected Patients

Treatment with interferon is generally recommended for patients with chronic hepatitis C who are at the greatest risk for progression to cirrhosis.[11-13] These patients have persistently elevated alanine aminotransferase (ALT) levels, detectable HCV RNA and liver biopsy results showing either portal or bridging fibrosis or at least moderate degrees of inflammation and necrosis. Indications for treatment in patients with persistently elevated ALT levels but with less severe histologic changes are less clear. In these patients, observation, including serial ALT measurements and a liver biopsy every three to five years, may be an acceptable alternative to treatment with interferon, because progression to cirrhosis is likely to be slow, if it occurs at all. Similarly, patients with compensated cirrhosis might not benefit from interferon therapy.

Interferon is not recommended in patients with persistently normal ALT values or advanced cirrhosis. Treatment of patients who drink significant amounts of alcohol or who inject illicit drugs should be delayed until these habits have been discontinued for at least six months. Interferon is contraindicated in patients with major depressive illness, cytopenias, hyperthyroidism, renal transplantation or evidence of autoimmune disease and in those who are pregnant.[4,11]

*How should a patient be managed who is anti-HCV positive (verified by supplemental test) and has normal liver enzyme levels?*

Patients should be periodically assessed by monitoring serum ALT values several times over six to 12 months. If ALT values are persistently normal, it is then reasonable to assess ALT values annually.

*When should a gastroenterologist or hepatologist be consulted in the management of HCV infected patients?*

A specialist in liver disease should be consulted for the management of anti-HCV-positive patients with elevated ALT values. Further evaluation may include determination of HCV RNA level and liver biopsy. Based on these findings, treatment with interferon may be recommended.

*Do all patients who are considered for antiviral treatment need to have a liver biopsy?*

Liver histology is the gold standard for assessing the severity of liver disease and the only means of diagnosing well-compensated cirrhosis. It is useful in determining not only inflammatory activity but also extent of fibrosis. Histologic grading of inflammatory activity and staging of fibrosis have also been shown to correlate with the risk of subsequent progression to cirrhosis. In addition, fibrosis score and cirrhosis have been identified as the most important independent predictive factors for response to interferon treatment.[14]

*Should interferon treatment be considered for children with chronic hepatitis C?*

Currently, interferon is only labeled for treatment of adults with chronic hepatitis

Because of the potential for adverse reactions, interferon is contraindicated in patients with

C. It is not labeled by the U.S. Food and Drug Administration for use in children under 18 years of age; however, limited experience with interferon therapy for chronic hepatitis C suggests an efficacy similar to that observed in adults. Referral of a child with chronic hepatitis C to a pediatric hepatologist or gastroenterologist for management should be considered if serum ALT levels are persistently elevated and there is evidence of active viral replication, such as HCV RNA detected by polymerase chain reaction testing. Because of limited experience with interferon therapy in children, enrollment into a clinical trial, if available, should be considered if this step is contemplated.[11]

a major depressive illness, hyperthyroidism, cytopenias, autoimmune disease, history of a kidney transplantation, and in those who are pregnant.

### What is the recommended regimen for interferon therapy?

The recommended regimen for interferon therapy is 3 million U administered subcutaneously three times a week for 12 months. If patients have persistently abnormal ALT levels and detectable serum HCV RNA after three months of interferon therapy, treatment should be discontinued. The advisability of entering these patients into clinical trials for other treatments should be explored.[11]

### What percentage of patients respond to interferon therapy?

Approximately 50 percent of treated patients have an initial response, with normalization of serum ALT activity and a loss or decrease of serum HCV RNA at the end of therapy. After interferon therapy is discontinued, however, more than one half of patients who responded to treatment relapse, with recurrence of elevated ALT levels and reappearance of serum HCV RNA. Thus, only 15 to 25 percent of treated patients have a sustained response one or more years after therapy ends.[11,15]

### Are there other treatment options for patients with chronic hepatitis C?

Ribavirin (Virazole), a nucleoside analog, has been evaluated in clinical trials alone and in combination with interferon.[16] In studies of patients treated with ribavirin alone, results demonstrated a decrease in ALT activity in about one third of patients, but no change in viral replication. In addition, when treatment was withdrawn, all patients relapsed, with recurrence of elevated ALT levels. Thus, monotherapy with ribavirin is not useful in the treatment of chronic hepatitis C.

The results of studies of patients treated with a combination of ribavirin and interferon, however, demonstrated a substantial increase in sustained response rates, reaching as high as 40 to 50 percent compared with interferon therapy alone. As with interferon-alone therapy, however, combination therapy in patients with genotype 1 (the most common strain of HCV in the United States) is not as successful; sustained response rates among these patients are still less than 30 percent. Combination therapy with interferon and ribavirin is now licensed for the treatment of chronic hepatitis C in patients who have relapsed following interferon treatment and for use in naive patients.

*What are the side effects of interferon therapy?*

Most patients experience flu-like symptoms early in treatment, but these symptoms diminish with continued therapy. Later side effects include fatigue, bone marrow suppression and neuropsychiatric effects such as apathy, cognitive changes, irritability and depression. The interferon dosage must be reduced in 10 to 40 percent of patients because of severity of side effects, and treatment must be discontinued in 5 to 15 percent.[11,13]

*Can anything be done to reduce some of the side effects of interferon therapy?*

Pretreatment with acetaminophen and administering interferon at night may help to alleviate the side effects.[11,13]

*Are there additional side effects associated with ribavirin?*

Yes. Ribavirin can induce hemolytic anemia, and use of this drug can be problematic in patients with preexisting anemia, bone marrow suppression or renal failure. Therefore, in these patients, combination therapy should be avoided, or attempts should be made to correct the anemia. Hemolytic anemia caused by ribavirin can also be life-threatening in patients with ischemic heart disease or cerebrovascular disease.[16] Ribavirin is teratogenic, and female patients should avoid becoming pregnant during therapy.

*Are there data on the efficacy of interferon or other antiviral treatment in preventing the long- term morbidity and mortality of hepatitis C?*

No. Effects of antiviral treatment on important clinical outcomes, including quality of life and disease progression, have not been determined.

This is Part II of a two-part article on hepatitis C. Part I, on serologic testing and diagnosis, appeared in the last issue (Am Fam Physician 1998;59:79-92.)

## REFERENCES

1. Krawczynski K, Alter MJ, Tankersley DL, Beach M, Robertson BH, Lambert S, et al. Effect of immune globulin on the prevention of experimental hepatitis C virus infection. J Infect Dis 1996;173: 822-8.
2. Centers for Disease Control and Prevention, Public Health Service inter-agency guidelines for screening donors of blood, plasma, organs, tissues, and semen for evidence of hepatitis B and hepatitis C. MMWR Morb Mortal Weekly Rep 1991;40 (RR-4):1-17.
3. Centers for Disease Control and Prevention, Health Resources and Services Administration, National Institute on Drug Abuse, Substance Abuse and Mental Health Services Administration. Medical advice for persons who inject illicit drugs. HIV Prevention Bulletin, May 1997. Retrieved September 1998 from the World Wide Web: http://www.cdc.gov/nchstp/hiv_aids/pubs/hiv_prev.txt.
4. Centers for Disease Control and Prevention. Recommendations for prevention and control of hepatitis C virus (HCV) infection and HCV-related chronic disease. MMWR Morb Mortal Weekly Rep 1998;47(RR-19):1-39.

Case 1:06-cv-01855-JDB    Document 14-5    Filed 02/20/2007    Page 22 of 26

5.  Centers for Disease Control and Prevention. Prevention of hepatitis A through active or passive immunization: recommendations of the Advisory Committee on Immunization Practices (ACIP). MMWR Morb Mortal Weekly Rep 1996;45(RR-15):1-30.

6.  Centers for Disease Control and Prevention. Hepatitis B virus: a comprehensive strategy for eliminating transmission in the United States through universal childhood vaccination: recommendations of the Immunization Practices Advisory Committee (ACIP). MMWR Morb Mortal Weekly Rep 1991;40(RR-13):1-25.

7.  Alter MJ, Mast EE, Moyer LA, Margolis HS. Hepatitis C. Infect Dis Clin North Am 1998;12:13-26.

8.  Schiff ER. Hepatitis C and alcohol. Hepatology 1997;26(3 Supple 1):39S-42S.

9.  Mast EE, Alter MJ. Hepatitis C. Semin Pediatr Infect Dis 1997;8:17-22.

10. Hepatitis Surveillance Report No. 56. Atlanta: Centers for Disease Control and Prevention, 1995:3-6.

11. National Institutes of Health Consensus Development Conference Panel Statement: management of hepatitis C. Hepatology 1997;26(3 Suppl 1):2S-10S.

12. Hoofnagle JH, Di Bisceglie AM. The treatment of chronic viral hepatitis. N Engl J Med 1997;336:347-56.

13. Fried MW. Therapy of chronic viral hepatitis. Med Clin North Am 1996;80:957-72.

14. Lok AS, Gunaratnam NT. Diagnosis of hepatitis C. Hepatology 1997;26(3 Suppl 1):48S-56S.

15. Poynard T, Leroy V, Cohard M, Thevenot T, Mathurin P, Opolon P, et al. Meta-analysis of interferon randomized trials in the treatment of viral hepatitis C: effects of dose and duration. Hepatology 1996; 24:778-89.

16. Reichard O, Schvarcz R, Weiland O. Therapy of hepatitis C: alpha interferon and ribavirin. Hepatology 1997;26(3 Suppl 1):108S-111S.

Copyright © 1999 by the American Academy of Family Physicians.
This content is owned by the AAFP. A person viewing it online may make one printout of the material and may use that printout only for his or her personal, non-commercial reference. This material may not otherwise be downloaded, copied, printed, stored, transmitted or reproduced in any medium, whether now known or later invented, except as authorized in writing by the AAFP.

January 15, 1999 Contents | Subscribe | Search | *AFP* Home Page

Medical Services | Health Information | Appointments | Education and Research | Jobs | About



MayoClinic.com Boo

Diseases & Conditions | Drugs & Supplements | Treatment Decisions | Healthy Living | Ask a Specialist | Health Tools

≫ **Home**   ≫ **Log in**   ≫ **Register now**   ≫ **RSS**

## INFECTIOUS DISEASE
This center sponsored by: **VaccinePlace.com**

# Hepatitis C

**ARTICLE SECTIONS**

- Introduction
- Signs and symptoms
- Causes
- Risk factors
- When to seek medical advice
- Screening and diagnosis

- Complications
- ☉ Treatment
- Prevention
- Self-care
- Complementary and alternative medicine

## Treatment

A diagnosis of HCV doesn't necessarily mean you need treatment. The National Institutes of Health recommends treatment for HCV if you have:

- A positive test result indicating hepatitis C virus circulating in your bloodstream

- A biopsy that indicates significant liver damage

- Elevated levels of a liver enzyme called alanine aminotransferase (ALT) in your blood

Even so, doctors continue to debate who needs treatment. If you have only slight liver abnormalities, your doctor may decide against medical treatment because your long-term risk of developing a serious disease is slight, and the side effects of treatment can be severe.

On the other hand, because there's no foolproof way to know whether you'll develop liver disease later on, your doctor may recommend fighting the virus. Improved treatment methods and a higher success rate in fighting hepatitis sometimes tip the argument in favor of more aggressive approaches.

**Drug therapies**
The standard of care for hepatitis C treatment is weekly injections of a drug called pegylated interferon alfa combined with twice-daily oral doses of ribavirin (Rebetol) — a broad-spectrum antiviral agent. Two pegylated interferon medications are available, peginterferon alfa-2b (Peg-Intron) and peginterferon alfa-2a (Pegasys).

The goal of HCV treatment is to clear the virus from your bloodstream. Combined pegylated interferon and ribavirin clear HCV infection in up to half of people with genotype 1 — the most common genotype found in the U.S. — and in up to 80 percent of those with genotypes 2 and 3.

If you have genotype 1 HCV, your doctor may recommend a course of relatively high-dose medications for 48 weeks. If you have genotype 2 or genotype 3, a 24-week course of medications at a lower dose may be adequate.

If one course of combined pegylated interferon and ribavirin doesn't clear
HCV from your bloodstream, your doctor may recommend a second course



Achiev
a healt
body
*and*
*have fu*
*doing*

GO

Advertising a
sponsorship p



**EXHIBIT**

C

HCV from your bloodstream, your doctor may recommend a second course of combination therapy. If your viral load declined during the first round of medications, a second round may clear the virus completely. Even if there was no change in your viral load during the first course of treatment, a second course may help reduce the damage HCV does to your liver.

## Side effects of medications

Side effects from interferon include severe flu-like symptoms, irritability, depression, concentration and memory problems and insomnia. Ribavirin can cause a low red blood cell count (anemia), gout and birth defects. Both drugs can cause skin irritation and extreme fatigue.

A small number of people taking combined pegylated interferon and ribavirin may experience psychosis or suicidal behavior. For this reason, treatment with interferon isn't recommended if you have a history of uncontrolled major depression. You're also not a good candidate for this treatment if you have untreated thyroid disease, low blood cell counts or autoimmune disease, or if you drink alcohol or use drugs and are unwilling to stop or seek help with stopping.

Side effects from combined pegylated interferon and ribavirin are generally most severe during the first weeks of treatment, and may be improved with pain relief medications and antidepressants. However, some people taking interferon need their dosage reduced because of severe side effects, and others must stop treatment altogether.

## Liver transplantation

The best treatment for people with end-stage liver disease is liver transplantation. However, the number of people awaiting transplants far exceeds the number of donated organs. But several new developments in transplantation may make it possible for more people to receive the organs they desperately need.

These developments include the donation of liver segments from living relatives, splitting one donated liver between two recipients, new organ allocation policies and, especially, new approaches to liver transplants for people with HCV.

Until recently, HCV-infected livers were routinely discarded. But studies show that people already infected with HCV who receive livers from HCV-positive donors can do as well as if they had received a liver not infected with the virus. This may mean that many more livers will become available for people with hepatitis C.

Liver transplantation does not cure HCV. The majority of people with hepatitis C who receive liver transplants experience a recurrence of the virus. Those with HCV who receive liver transplants also are at greater risk of developing cirrhosis within five years than are people with HCV who don't receive a transplant. Treatment with HCV-fighting medications may help prevent a recurrence of infection or treat recurrent illness that develops after a liver transplant.

€ PREVIOUS |                    | NEXT: Prevention

## RELATED

MayoClinic.com Bookstore
- 'Mayo Clinic on Digestive Health,' Second Edition (Softcover)

Web Resources
- National Center for Complementary and Alternative Medicine
- American Liver Foundation
- Hepatitis Foundation International
- Centers for Disease Control and Prevention

## ARTICLE TOOLS

Print this section | All

sections

 E-mail this

A⁺ Larger type



Enter e-mail address

sign up

more information

By Mayo Clinic Staff
Sep 14, 2005

© 1998-2007 Mayo Foundation for Medical Education and Research (MFMER). All rights reserved. A single copy of these materials may be reprinted for noncommercial personal use only. "Mayo," "Mayo Clinic," "MayoClinic.com," "EmbodyHealth," "Reliable tools for healthier lives," "Enhance your life " and the triple-shield Mayo Clinic logo are trademarks of Mayo Foundation for Medical Education and Research.

DS00097

About this site  ▪  Site help  ▪  Contact us  ▪  e-Newsletter  ▪  Site map

Privacy policy updated Oct 4, 2006
Terms and conditions of use updated Dec 29, 2006

LEGAL CONDITIONS AND TERMS OF USE APPLICABLE TO ALL USERS OF THIS SITE. ANY USE OF THIS SITE CONSTITUTES YOUR AGREEMENT TO THESE TERMS AND CONDITIONS OF USE.

© 1998-2007 Mayo Foundation for Medical Education and Research. All rights reserved.



ACCREDITED

Medical Services | Health Information | Appointments | Education and Research | Jobs | About

MayoClinic.com Boo

**MayoClinic.com**
Tools for healthier lives

Diseases & Conditions | Drugs & Supplements | Treatment Decisions | Healthy Living | Ask a Specialist | Health Tools

≫ Home  ≫ Log in  ≫ Register now  ≫ RSS

## INFECTIOUS DISEASE
This center sponsored by: **VaccinePlace.com**

Feb 9

# Hepatitis C

### ARTICLE SECTIONS

- Introduction
- Signs and symptoms
- Causes
- Risk factors
- When to seek medical advice
- Screening and diagnosis
- Complications
- Treatment
- Prevention
- Self-care
- Complementary and alternative medicine

## Screening and diagnosis

A blood test can determine whether you have hepatitis C. If test results indicate that you have HCV, your doctor may measure the quantity of the virus in your blood (viral load) and evaluate the genetic makeup of the virus (genotype). There are six known HCV genotypes. Knowing which genotype you have will help your doctor determine the best course of treatment for you and how likely you are to respond to treatment.

Your doctor may also recommend a liver biopsy, a procedure in which a small sample of liver tissue is removed for microscopic analysis. Before the biopsy, you'll receive a local anesthetic to decrease the pain. Your doctor then inserts a thin needle into your liver to remove the tissue sample. Liver biopsy is unlikely to have any complications, although you may have some pain or bleeding afterward. Rarely, significant bleeding can occur.

Although a biopsy isn't necessary to confirm a diagnosis of hepatitis C, it can help determine the severity of the disease and guide treatment decisions. It may also help rule out other causes for your liver problem, such as alcoholic or drug-induced hepatitis, autoimmune hepatitis or excess iron (hereditary hemochromatosis).

PREVIOUS |                                    | NEXT: Complications

### RELATED

MayoClinic.com Bookstore
- 'Mayo Clinic on Digestive Health,' Second Edition (Softcover)

Web Resources
- National Center for Complementary and Alternative Medicine
- American Liver Foundation
- Hepatitis Foundation International
- Centers for Disease Control and Prevention

### ARTICLE TOOLS

Print this section | All sections

ADVERTISE

MayoClinic

▶ Visit our
**Bookstore**

CLICK HERE

Tools for Healthier

*Reliable*
*Information*
*for a*
*Healthier Li*

Find out ho
this remarkal
monthly
publication c
help you tak
control of yo
health and
your life.

Get a
complimenta
trial issue
and two
**FREE**
special repor
*Weight Conh*
and *Arthrit*

Don't miss th
special offer
*Order today*

**Mayo Cli**
**Health Le**

Advertising a
sponsorship p

 E-mail this
Larger type



Enter e-mail address

more information

By Mayo Clinic Staff
Sep 14, 2005

© 1998-2007 Mayo Foundation for Medical Education and Research (MFMER). All rights reserved. A single copy of these materials may be reprinted for noncommercial personal use only. "Mayo," "Mayo Clinic," "MayoClinic.com," "EmbodyHealth," "Reliable tools for healthier lives," "Enhance your life," and the triple-shield Mayo Clinic logo are trademarks of Mayo Foundation for Medical Education and Research.

DS00097

About this site  ▪  Site help  ▪  Contact us  ▪  e-Newsletter  ▪  Site map

Privacy policy updated Oct 4, 2006
Terms and conditions of use updated Dec 29, 2006

LEGAL CONDITIONS AND TERMS OF USE APPLICABLE TO ALL USERS OF THIS SITE. ANY USE OF THIS SITE CONSTITUTES YOUR AGREEMENT TO THESE TERMS AND CONDITIONS OF USE.

© 1998-2007 Mayo Foundation for Medical Education and Research. All rights reserved.



ACCREDITED



EXPRESS SCRIPTS

**Drug Library** | **Check Interactions** | **Compare Drugs** | **Conditions & Treatments** | **Interactive**

## Treatment Options

## Interferons



**Search**

○ Drugs & Herbs
○ Conditions
○ News & Reviews

7 Steps to Safety

for Savings

Senior Corner

Glossary

eBulletins

Home

Express Scripts Member?

Interferons are proteins that the body's immune system normally produces to help fight vir control the replication of cells, and regulate the immune system. Pharmaceutical companie the ability to produce specific interferons for use as injectable drugs to treat different cond About one-third to one-half of chronic hepatitis patients with normal functioning immune s will experience relief of symptoms and slowing of the progression of the illness when treat interferon. Some people will go into remission, meaning their liver function will appear nor the virus will be undetectable, but this does not always last. Interferons may cause many unpleasant side effects, including fever, chills, fatigue, headaches, muscle or joint aches, dizziness, or vomiting, which could cause many people to stop using the medication.

### Drugs in the class

Interferon Alfa-2a (Roferon-A (alfa-2a))

Peginterferon alfa-2a (Pegasys)

Peginterferon alfa-2b (Peg-Intron)

---

**Note:** The above information is intended to supplement, not substitute for, the expertise and judgment of yo physician, pharmacist, or other healthcare professional. It is not intended to diagnose a health condition, but used as a guide to help you decide if you should seek professional treatment or to help you learn more about condition once it has been diagnosed.

 Recommend this page to a friend

---

Drug Library | Check Interactions | Compare Drugs | Conditions & Treatments | Interactive Tools
Contact Us | About Us | Partners & Alliances | Privacy Policy | Disclaimer | Meet the Experts | Site Map
© 2007 Express Scripts, Inc. All Rights Reserved.

We comply with the HONcode standard for health trust worthy information: verify here.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MONROE L. COLEMAN-BEY ) | |
| ) | |
| Plaintiff, ) | Civil Action No.: 06-1855 (JDB) |
| ) | |
| v. ) | |
| ) | |
| United States of America ) | |
| ) | |
| Defendant. ) | |

ORDER

Upon consideration of defendant's motion to dismiss, or in the alternative for summary judgment, plaintiff's response thereto, and the entire record in this matter, it is hereby

Ordered that the defendant's motion is GRANTED and plaintiff's petition for mandamus is DISMISSED.

Date: _____

_____
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MONROE L. COLEMAN-BEY | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 06-1855 (JDB) |
| | ) | |
| v. | ) | |
| | ) | |
| United States of America | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

ORDER

Upon consideration of defendant's motion to dismiss for lack of venue, or in the alternative for transfer to the Southern District of Indiana, plaintiff's response thereto, and the entire record in this matter, it is hereby

Ordered that the defendant's motion is GRANTED and plaintiff's petition for mandamus is transferred to the Southern District of Indiana.

Date: _____        _____
                                        UNITED STATES DISTRICT JUDGE